PECK-WILLIAMSON HEATING & VENTILATING CO. *v.*
McKNIGHT & MERZ *et al.*

(*Jackson.* April Term, 1918.)

1. **COURTS.** Federal decisions as authority.

Whether a transaction by a foreign corporation is interstate commerce, as distinguished from doing business in the State, is a federal question, on which decisions by the federal supreme court must be followed by the State courts. (*Post, pp.* 575-578.)

2. **COMMERCE.** Interstate commerce. Sales. "Doing business."

A foreign corporation did business within the State, as distinguished from interstate commerce, where it furnished and installed a heating plant, which was not so complicated that it had to be installed by the corporation, the installation representing forty-two per cent. of the cost. (*Post, pp.* 575-578.)

3. **CORPORATIONS.** Foreign corporations. Doing business.

A foreign corporation, which furnished and installed a heating plant, which was not so complicated that the corporation had to install it, did business in the state. (*Post, p.* 578.)

Cases cited and approved: Browning v. Waycross, 233 U. S., 16; Palm Vacuum Cleaner Co. v. Bjornstad, 136 Minn., 38; Milan Milling Co. v. Gorten, 93 Tenn., 590; General Railway Signal Co. v. Virginia, 246 U. S., 500; Amusement Co. v. Albert, 128 Tenn., 417.

4. **CONTRACTS.** Performance. "Satisfactory."

Where one in whose favor the term "satisfactory" was used in a contract insisted on its use, he had the right to determine whether the work done was satisfactory, and his determination could not be said to be capricious, where he added other work to make it satisfactory. (*Post, pp.* 578, 579.)

5. **CONTRACTS.** Performance.

Where a test for ventilation to ascertain whether a heating plant was satisfactory to the property owner might have been

made by the use of an anemometer, but was not made, his right to resist payment because work was not satisfactory was waived. (*Post, pp.* 579, 580.)

6. CORPORATIONS. Foreign corporations. Contract.

Where a contract by a foreign corporation was unenforceable, because it was illegally doing business in the State, a new contract, to add features to cover deficiencies in the design of the work done, was also invalid. (*Post, p.* 580.)

Cases cited and approved: Cary-Lombard Lumber Co. v. Thomas, 92 Tenn., 592; Cunnyngham v. Shelby, 136 Tenn., 178.

7. CORPORATIONS. Foreign corporations. Contracts.

A contract by a foreign corporation illegally doing business in the State is void on the ground of public policy, and is incapable of ratification or estoppel by the conduct of the other party. (*Post, pp.* 580, 581.)

Cases cited and approved: Singer Mfg. Co. v. Draper & Looney, 103 Tenn., 262; Wright v. Jackson Construction Co., 138 Tenn., 145; Reed v. Johnson, 27 Wash., 42.

---

FROM MADISON.

---

Appeal from the Chancery Court of Madison County.—Hon. J. W. Ross, Chancellor.

'D. W. HERRING, for complainant.

R. F. SPRAGINS, for defendants.

MR. CHIEF JUSTICE NEIL delivered the opinion of the Court.

The orginial bill was filed against McKnight & Merz and D. L. Williamson to enforce a mechanic's lien on the Lyric Theater, in Jackson, Tenn. The

lien asserted was based on a contract made with McKnight & Merz on July 9, 1913. Williamson was made a defendant because, after the making of the contract, he purchased the property from McKnight & Merz, and to enforce a contract he made with complainants.

The first contract provided that the complainant should furnish to McKnight & Merz a heating and ventilating equipment for the sum of $1,500. This contract, after specifying the main parts of the equipment, consisting of two furnaces, a blower, a fan connected directly with a motor, also a motor and belt, added as other things to be furnished:

"Galvanized iron heat risers, basement heat pipes, mixing valves, volume dampers, I-beams, bearing bars, V-crimped covering of iron and steel partitions, smokepipe, grills for vent and heat openings, and other materials, and labor necessary to install the heating and ventilating plant according to his [McKnight & Merz's] plans in the Lyric Theater Building for second party."

Half of the consideration was to be paid when the equipment was delivered, and the balance upon completion of the work; the plant to be tested by the complainant's superintendent and found in good working order in the presence of McKnight & Merz.

The contract also provided that McKnight & Merz should furnish at their own expense materials and labor necessary for excavation, masonry, cement, carpenter, and lath and plaster work in connection

with the installation of the heating and ventilating plant, and should also bring the electric wires for the motors to the basement of the building.

The complainant guaranteed that the equipment, materials, and workmanship should be first class, and that shipment should be made in ample time, "and installation upon due notice from second party [McKnight & Merz] that he is ready for same."

The contract also provided that McKnight & Merz were to receive the equipment and materials upon arrival in the Jackson freight station, pay the freight and drayage, and have the same delivered on the building premises, or in the building, and properly cared for until the arrival of the complainant's workmen, deducting the freight, and the handling charges from the contract price, and that these were to be credited thereon.

The contract also contained this provision:

"First party further guarantees that the complete plant, when operated to instructions, will be efficient as follows: (1) Deliver nine thousand four hundred and eighty cubic feet outside air per minute to building. (2) Exhaust nine thousand cubic feet of air from the building per minute. (3) Change air in the building four and one-half times per hour. (4) Maintain sixty degrees temperature Fahrenheit in building when the outside air is ten degrees below zero; doors and windows to be properly fitted and kept closed, except ingress and egress."

The work seems to have been done to the satisfaction of McKnight & Merz, and they issued the complainant a check for the amount due, but the check was not paid.

Defendant Williamson bought the property before any of the material was delivered in the building or on the property, but after the motor had been delivered at the freight depot in Jackson. No formal notice was given to the defendant Williamson by the complainant, but he was present from time to time during the progress of the work, in the installation of the equipment, and had as full knowledge as any notice could have given him. At least on one occasion he gave directions about the disposition of certain parts of the equipment. Under the contract between him and McKnight & Merz the latter were to provide the heating and ventilating plant and to pay for it, Williamson taking a bond to fully protect himself against the lien.

After the check given by McKnight & Merz for the equipment had been turned down at the bank the orginal was filed to enforce the lien.

Among the defenses made by Williamson was one to the effect that the equipment did not properly heat the building; that the greater part of the heat rose to the top of the auditorium, leaving the lower part cold and making the upper part too hot.

The complainant's reply to this contention was in effect that the equipment performed accurately the requirements made of it in the contract, and that the

contract contained no provision that the heat should be evenly distributed through the auditorium; that McKnight & Merz wanted a cheap equipment, and they were given just what they contracted for. This contention seems to be sustained by the evidence.

Defendant Williamson was left in this situation. He had bought the property from McKnight & Merz, and it was heated in such a manner as that it was not comfortable to his patrons. Therefore he and the complainant entered into a contract as between themselves. This contract is in the following language:

"This agreement, this day, by and between the Williamson Heater Company, of Cincinnati, Ohio, party of the first part, and D. L. Williamson of Jackson, Tennessee, party of the second part, witnesseth:

"(1) Party of the first part agrees to furnish the material and labor and to make certain changes and alterations in the heat and ventilating plant in the Lyric Theater, in Jackson, Tennessee, as follows, to wit: Take down the galvanized iron connection to the present 42"x42" grills on each side of the stage, and turn G. I. elbows through the first wall panels on either side of the stage, so that the two outlets will come out under the balcony, so as to direct and force the two currents of air towards the rear of the house at such an angle as to make them converge at a point underneath the rear of the balcony. These two heat outlets will be covered with wire grills approximately 30"x60" and will be equipped with adjustable louvre dampers behind the grills, so that the air can be

deflected at different angles toward the floor if desired. These two G. I. connections will be painted with lead and oil to match as nearly as possible the color and tinting of the surrounding walls; also to run a 20″x20″ G. I. connection between the furnaces and the underfloor 20″x20″ concrete duct which connects with the two floor registers near the entrance doors, this duct to be provided with suitable dampers. Party of the first part will also readjust the alignment of the motor driving the fan, and will also install two G. I. ventilators approximately 36″ in diameter in the roof above the rear of the balconies, furnishing same with dampers and chains for operating them. All of said additions and changes shall be made in a workmanlike manner and out of first-class material, and to be completed on or before the 21st day of December, 1914. Party of the first part further agrees that, in performing said work, all proper and reasonable precautions will be used to prevent and avoid injuries or damage to the building, and that all damaged places will be repaired.

"(2) After the above-mentioned work is completed party of the first part guarantees that the heating plant, when properly operated, will heat the main or first floor part of the said theater to a reasonably, uniform temperature of 70° F. in zero weather, and that at the same time the rise in temperature in the balcony or second floor of the building will not be more than 10° above the temperature on the main or first floor.

"(3) After the performance of said work and the fulfilling of said conditions, party of the second part agrees to pay to party of the first part the sum of two hundred dollars ($200), which shall · be applied by party of the first part as a credit on its claim against McKnight & Merz for the contract price of the heating plant installed in said theater by party of the first part under contract with said McKnight & Merz. The plant is to be tested and the said sum of two hundred dollars ($200) paid by the party of the second part to party of the first part within thirty days after said additions and changes have been completed by the party of the first part.

"(4) And party of the second part further agrees that, if he is satisfied with said heating and ventilating system after the completion of said work and testing of said plant, he will pay by not later than February 25, 1915, to party of the first part, the balance due on said original contract price, to wit: One thousand forty dollars and sixty-four cents ($1,040.64), which shall be received by party of the first part in full of all demands against party of the second part, as well as against McKnight & Merz, under the original contract with them for the installation of said heating and ventilating plant, and will surrender and discharge any mechanic's lien claimed by party of the first part for work done or material furnished in installing said plant.

"(5) In performing the work herein contemplated, party of the first part agrees that the same shall be

commenced and carried on at such times as will not interfere with the dates for shows now booked for said theater.

"(6) If said heating and ventilating system shall not for any reason fulfill the conditions in paragraph (2) above, said party of the second part shall immediately notify party of the first part, and the latter shall have the right to be present by a representative and witness a test of said system. Said notification and tests shall be made not later than February 25, 1915.

"(7) It is understood and agreed that the rights of neither party hereto are to be prejudiced by this agreement or the work to be done hereunder; that by entering into this agreement and performing the work herein contemplated, party of first part does not admit a breach of contract on its part as to any of said work nor waive any lien it may have; and party of second part, by entering into this agreement does not admit any lien claimed by party of the first part, nor any liability to party of first part, nor does he waive any rights or claims he may have, but the rights of the parties are to exist and remain unimpaired as though this agreement had not been made, and no reference is to be made hereto in any court proceeding."

Dated December 8, 1914.

After an effort to comply with this contract which was not satisfactory to defendant Williamson, a supplemental bill was filed to hold him liable on the con-

tract for $1,040.64, the balance left of the $1,500 after crediting the $200 mentioned in the above instrument, which had already been reduced by other payments or charges.

The chancellor deducted about $375.87, with interest thereon, in all $423.79, from the $1,040.64 and interest thereon, in all $1,286.06. This left the sum of $862.27, for which sum he declared a lien on the theater in favor of the complainant. The $375.87 constituted the sum which Williamson had expended in making the equipment satisfactory to him after the contract of December 8, 1914, had failed of compliance on the part of complainant. For this sum, with its interest, in all $423.79, the chancellor rendered a decree against the complainant, but did not award execution—simply offset this amount against the amount of $1,286.06, leaving the balance of $862.27, for which the lien was declared.

The complainant appealed from the decree and assigned as error, in substance, that the chancellor should have given a personal decree against Williamson for the whole amount, $1,286.06, and should not have reduced this sum by the allowance of the offset above mentioned, but should have declared a lien for the whole amount on the property, and also given a personal judgment against Williamson therefor.

The defendant Williamson appealed, and assigned as error, in effect, that any amount was allowed to complainant.

The case was elaborately argued at the bar and very voluminous briefs were filed, all of which have been carefully examined.

There is a fundamental point relied on by the defendant, which we think must result in the defeat of the complainant as to the assertion of any lien under the contract of July 9, 1913. This defense depends upon a fact not previously stated, which is that the complainant is a foreign corporation, and has not qualified itself to do business in this State pursuant to our statutes. It is perceived from the contract, the substance of which we have recited, that the complainant was to install the equipment in the theater building, and it did so. It sent its workmen to Jackson from its home in Ohio. It also employed other labors in Jackson, and it purchased part of its material in Jackson, employing certain mechanics here to manufacture a part of the equipment, and the cost of this installation is thus shown by complainant's Mr. Murphy:

"Q. Please state, Mr. Murphy, what proportion of the actual cost of the plant to your company, including material and labor installed in the Lyric Theater at Jackson, Tenn., represents cost of installation? A. Forty-two per cent. of the total cost, including labor, expense, and material represented by the cost of installation. Q. Was the cost of installation taken into consideration by you at the time you agreed to install said plant for the sum of $1,500? A. It was. Q. You testified in your cross-examination, Mr. Murphy, that

as a general rule your company sold the material to dealers and that they did the installation. Was that the case in reference to the plant installed in the Lyric Building at Jackson? A. It was not. Q. Now, where plants are installed by your dealers, who pay the freight on the material shipped? A. The dealer pays the freight. The matter is sold f. o. b. cars, our factory. Q. In reference to the plant installed in the Lyric Theater, who paid the freight on the necessary material which was shipped for that job? A. We paid the freight, through McKnight & Merz, who charged it to our account. Q. In making your estimate of the proportionate cost of this plant that is represented by the cost of installation, you included in the cost of installation, did you not, the traveling expenses and hotel bills of the company's representative, Mr. Hommel? A. Yes, sir.''

It does not appear that the equipment furnished the Lyric Theater was of such a complicated nature that an expert from complainant's factory had to be sent to install the work. Complainant's practice was to sell the equipment outright to dealers in the various localities where they sold their goods. In such cases the dealer who had purchased the equipment would install it. The complainant advertised in the magazines and other vehicles of public information, and when it received an inquiry from a prospect, as an intending purchaser is called, this was referred to complainant's dealer in the town or city, if there were such dealer in business there. If there were no such

dealer, complainant took the matter up with "the prospect" himself, and in such cases included in his contract an agreement to effect the installation itself. In the case before us it appears that the complainant, as all ready stated, agreed to make and did make the installation, which covered forty-two per cent. of the total cost, employing local workmen to do part of the work, and local manufacturers to furnish part of the materials. However, the part of the materials manufactured here was small in comparison with the whole of the equipment.

We think it quite clear that these facts show a doing of business in Tennessee by a foreign corporation which had not complied with our law authorizing the doing of such business. *Browning* v. *Waycross,* 233 U. S., 16, 34 Sup. Ct., 578, 58 L. Ed., 828. In that case it was held that, where a foreign corporation sold lightning rods to a resident of Georgia, with an agreement to install them on the house of the purchaser, this was not an interstate commerce transaction; that the matter of installation was a doing business within the State, it not appearing that it was an essential and necessary part of the sale of the particular machinery that the seller should install it. See, also, *Palm Vacuum Cleaner Co.* v. *Bjornstad,* 136 Minn., 38, 161 N. W., 215, L. R. A., 1917C, 1012, and note thereto. It will be seen from the cases cited in the note that the rule stated in *Browning* v. *Waycross* has been very generally followed. The question being a federal one, it is the

duty of the State supreme courts to follow the decisions of the supreme court of the United States in respect thereto. We had a case, decided some years ago, *Milan Milling Co.* v. *Gorten,* 93 Tenn. (9 Pick.), 590, 27 S. W., 971, 26 L. R. A., 135, holding that, where certain milling machinery was furnished by a foreign corporation to a purchaser in this State, the fact of installation by the seller did not affect the interstate character of the transaction. It does not appear from the report of the case to what extent work was done in effecting the installation, nor whether the machinery was of such a complicated nature that it was essential that the seller should itself install the plant. If there be indeed a conflict, that case must yield to the decision of the supreme court of the United States above referred to, to whatever extent there may be conflict between the two. It is best that there should be a uniformity in the rule on this subject, and indeed necessary that we should follow the federal authority above referred to. There is a very recent decision of the Supreme Court in thorough accord with *Browning* v. *Waycross.* This case is *General Railway Signal Co.* v. *Virginia,* 246 U. S., 500, 38 Sup. Ct., 360, 62 L. Ed.,—.

It is insisted for complainant that this is an isolated transaction, and therefore it should not be considered as doing business in Tennessee. In the case before us it appears that the complainant was engaged in the business of furnishing and installing such equipment in Tennessee, and that it had, on at least five different

occasions, in 1912, 1913, and 1914, installed such equipment—two in Union City, Tenn., one in Dover, one in Tiptonville, and one in Jackson, besides the one we have now under consideration. So that it appears the transaction we are now examining was not an isolated one, and therefore the question of law suggested need not be considered.

From what has been said, we think there is no escape from the conclusion that the complainant was illegally doing business in Tennessee, when it made the contract of July 9, 1913, and installed the equipment therein mentioned. Therefore there can be no recovery under that contract. *Amusement Co.* v. *Albert,* 128 Tenn., 417, 161 S. W., authorities cited.

We shall now consider the question whether there can be a recovery under the contract made with defendant Williamson sued upon in the supplemental bill. It is perceived from that contract that Williamson agreed to pay the balance due on the obligation of July 9, 1913, $1,040.64, on condition that certain additional work on the equipment should be done by the complainant, and that the result should prove satisfactory to him. Under this contract he was to pay $200 for the additional work, and this was to be credited on the contract of McKnight & Merz, and reduced it to $1,040.64. This work was done, but the result did not prove satisfactory to Williamson, and he declined to pay the $1,040.64. He contended that, while the change made by the complainant improved the heating capacity, it injured the ventilation. The

complainant contended that, while one of the pipes, with two openings intended for ventilation, was turned to purposes of heating, yet this was compensated by an opening made in the ceiling. It is a matter difficult to decide between the two contentions, but it is certain that defendant Williamson was not satisfied, and in order to make the work satisfactory he added other work, which cost the amount which the chancellor allowed him as an offset in the decree which we have already referred to.

There is a conflict in the authorities as to the meaning of the term "satisfactory," so used in a contract. It is held, perhaps by the weight of authority, that, where such term appears in the contract, the party in whose favor it was reserved has the absolute right to determine the question, and to act accordingly—that is, either accepting or rejecting the work, provided his act is not merely capricious. Other authorities hold that such term is fully met where the work, as done, should be satisfactory to a reasonable man. Without now deciding between these two views, it is sufficient to say that this particular term was not lightly used in the contract. It was made the subject of correspondence between the parties. Complainant was very loath to use it, saying it had had so much trouble with agreements in which this word appeared that it had ceased to admit such term into its contracts. Williamson insisted, and would sign no other; thereupon the complainant yielded. So we think the parties must have under-

stood that Williamson was to have the absolute right to determine for himself whether the work as done effected a result satisfactory to himself. We think his determination was not capricious, because he would not have spent the additional sum which he did spend merely to satisfy a caprice.

It is insisted in behalf of the complainant that, inasmuch as Williamson made no test to ascertain whether the work as done produced the satisfactory results provided for in section 2 and section 4 of the contract, and did not call upon and notify the complainant with a view to making such test, he waived the right to resist payment.

Defendant Williamson insisted that there was no suitable weather to make the test for heat, as the weather did not reach the degree of severity indicated in section 2, and this seems to have been proven. Defendant insists that he was not bound, therefore, to make the test by Feburary 25, 1915. So far as he was concerned, this seems not to have been material, because the heating apparatus proved satisfactory in that respect. The only trouble was with the ventilation. It is shown in the evidence that the test for the latter purpose might have been made at any time by the use of an anemometer, but it was not made. So we think the defendant waived his right to resist the payment of a proper sum on the ground that the work was not satisfactory. Still the complainant, seeking equity, will be bound to do equity, and we think the offset allowed by the chancellor was

a correct one, and must be allowed here, if the contract of December 8, 1914, is a lawful one.

Defendant insists that it is not, because it affirmatively appears in the evidence that complainant did not between the date of the first and the second contract, or at any time, comply with our laws on the subject of foreign corporations doing business here. Complainant insists that the work done under the latter contract was repair work, and therefore the statute would not apply. Not conceding that complainant would have the right to the repair work without complying with the law referred to, we are clearly of the opinion that the work was not of that description. The purpose of the new contract was not to effect repairs on the old work, but to add new features to cover deficiencies in the form—not in the quality of the work; but in the design. This design, when carried out according to specifications, resulted in unequal heating; the upper floor being too hot, and the lower too cold. To correct this, and distribute the heat evenly over the building, the new work was contracted for and performed. So we are constrained to hold that the new contract was illegal, on the same grounds on which we have held the old or first contract was unenforceable. *Cary-Lombard Lumber Co.* v. *Thomas,* 92 Tenn., 592, 593, 22 S. W., 743; *Cunnyngham* v. *Shelby,* 136 Tenn., 178, 188 S. W., 1147, L. R. A., 1917B, 572, and cases cited.

This result is not obviated by the fact that the defendant himself signed the contract, nor by the fact

that he made a payment thereon, or pleaded a set-off thereto, or received benefits thereunder.   Being held void on the ground of public policy, and not for the benefit of the defendant, it is incapable of ratification or estoppel by his conduct.   *Singer Mfg. Co.* v. *Draper & Looney,* 103 Tenn., 262, 52 S. W., 879; *Wright* v. *Jackson Construction Co.,* 138 Tenn., 145, 196 S. W., 488; *Reed* v. *Johnson,* 27 Wash., 42, 67 Pac., 381, 57 L. R. A., 404.

It follows that the chancellor's decree must be reversed, and the bill dismissed, as complainant's costs.