Richmond Screw Anchor Company *et al. v.* E. W.
Minter Company, Incorporated *et al.*

(*Knoxville,* September Term, 1927.)

Opinion filed November 21, 1927.

### 1. JURISDICTION. APPEAL.

The Supreme Court is without jurisdiction to review the action of
the Court of Appeals in overruling the claims of several com-
plainants where they have filed no petition for certiorari. (Post,
p. 26.)

Citing: Brown v. Brown, 155 Tenn., 530, 296 S. W., 356.

### 2. ILLEGAL CONTRACTS. RELIEF DENIED.

The courts will deny any relief upon any illegal contract or trans-
action whenever the illegality is made to appear whether in the
pleadings or proof, and will repel the party guilty of the illegal-
ity from the court whenever the fact appears. (Post, p. 27.)

Citing: Cary-Lombard Lumber Co. v. Thomas, 92 Tenn., 587, 594.

### 3. FOREIGN CORPORATIONS. PROPERTY.

The amendment to the penal clause of our domestication law so
changed it as to permit a noncomplying foreign corporation to own
or acquire property in the State without incurring the penalty.
(Post, p. 29.)

Citing: Chapter 81, Acts of 1891; chapter 81, Acts 1895; Louisville
Property Co. v. Nashville, 114 Tenn., 213, 219.

### 4. FOREIGN CORPORATIONS. DOMESTICATION STATUTES. LEGISLATIVE INTENT.

In the passage of our domestication statutes it was manifestly the
legislative intent not to require domestication of foreign corpo-
rations as a condition to the entry into the State for all purposes;
but to confine the prohibition to such corporations which should
undertake to do business in the State. (Post, p. 29.)

### 5. FOREIGN CORPORATIONS. DOMESTICATION STATUTES. LEGISLATIVE INTENT.

The legislative intent was to penalize a foreign corporation who
should attempt to carry on business in this State in such a way

as to entitle it to the privileges of domestication without first complying with the terms and conditions of the statute. (Post, p. 30.)

6. FOREIGN CORPORATIONS.  CONTRACTS.

A foreign corporation which makes a contract, in another State, for furnishing materials and the installation thereof in a building in this State, where there is no evidence of an intention on the part of the corporation to transact any other business in this State, or to continue therein after the completion of the one building referred to in said contract, is not required to domesticate as an incident to maintaining a suit in the courts of this State on such contract. (Post, p. 30.)

Citing: Cooper Mfg. Co. v. Ferguson, 113 U. S., 727, 28 L. Ed., 1137; Davis & Rankin Co. v. Caigle (Chy. App.), 53 S. W., 240; Cary-Lombard Lumber Co. v. Thomas, 92 Tenn., 587; Milan Milling Co. v. Gorten, 93 Tenn. 590; New York, etc., B. & L. Association v. Cannon, 99 Tenn., 345; Gilmer v. Savings & Loan Co., 103 Tenn., 272; Harris v. Water & Light Co., 108 Tenn., 246; Lumber Co. v. Moore, 126 Tenn., 313; I. J. Cooper Rubber Co. v. Johnson, 133 Tenn., 562; Amusement Co. v. Albert, 128 Tenn., 429; Peck-Williamson Heating & Ventilating Co. v. McKnight & Merz, 140 Tenn., 563; Lloyd Thomas Co. v. Grosvenor, 144 Tenn., 347; National Plastic Relief Co. v. Signal Amusement Co., 151 Tenn., 235; Lummus Cotton Gin Co. v. Arnold, 151 Tenn., 540.

7. FOREIGN CORPORATIONS.  CONTRACTS.  EVIDENCE.

The time required to execute a contract by a foreign corporation in this State may in proper cases be treated as evidence of an intention to carry on business which would bring it within the application of our domestication statutes, but where the contract called for material and work in a single building the length of time required should not be regarded as a test of the application or non-application of the statutes. (Post, p. 36.)

8. FOREIGN CORPORATIONS.  SUPPLEMENTAL CONTRACTS.

Where a foreign corporation has entered into ǀa contract for material and the installation thereof in a single building in this State (the contract having been entered into without the State), enters into agreements for certain extra material and labor for the building, such extra agreements are merely incidental and supplemental to the principal transaction and do not constitute

doing business within the State as required. by domestication statutes, even though such supplemental agreements were' made in Tennessee. (Post, p. 36.)

9. FOREIGN CORPORATIONS. PRIVILEGE TAX. EVIDENCE.

The payment of a privilege tax by a foreign corporation engaged in a single transaction in this State so as not to be within the provisions of our domestication statute was a protection against the violation of the State Revenue Law, and is not evidence that such foreign corporation is doing business within the State so as to require domestication. (Post, p. 37.)

10. FOREIGN CORPORATIONS. PRIVILEGE TAX.

A foreign corporation engaged in a single business transaction in the State so as not to be within the application of the domestication statutes may nevertheless be exercising a taxable privilege under our revenue law. (Post, p. 37.)

10a. FOREIGN CORPORATIONS. DOMESTICATION.

The fact that a foreign corporation had some years previous engaged in a single transaction within the State similar to the one involved, is not sufficient evidence to show that said corporation was engaged in doing business within the State so· as to require domestication. (Post, p. 37.)

11. FOREIGN CORPORATIONS. DOMESTICATION. VIOLATION OF LAW.

A foreign corporation required by our statutes to domesticate does not violate said statute by shipping material in interstate commerce into the State to be used in its operations in carrying out a contract made within the State when it meets all of the requirements of the statute prior to its actual entry into the State for the purpose of performing the intrastate features of the contract. (Post, p. 37.)

Distinguished: K. C. S. Steel Co. v. Arkansas, 269 U. S. 148, 70 L. Ed., 204.

12. PRIVILEGE TAX. INTERIOR DECORATOR.

The work of an interior decorator is such that requires extraordinary skill and talent not such as is required by an ordinary painter, and he is not required to pay a privilege tax under our revenue law. (Post, p. 39.)

Citing: Chapter 75, Acts of 1925.

13. MASTER'S REPORT. CLERICAL ERROR. JURISDICTION.

The Court of Appeals is not warranted in modifying the report of a master for a clerical error where the proof is confused and ambiguous. (Post, p. 40.)

14. MECHANIC'S LIEN. NOTICE.

The action of the owner in notifying the lienors that the building was completed on a premature date is not a waiver of any defense which then existed to the fixing of the liens. (Post, p. 44.)

15. MECHANIC'S LIEN. PRINCIPAL AND SURETY.

Where the owner has not waived any defenses to the liens which had been properly perfected, the surety on contractor's bond is bound. (Post, p. 42.)

16. MECHANIC'S LIEN. LIABILITY OF OWNER.

Our lien law places the owner in such a position that he may be subjected to double payment unless he exercises reasonable care and caution to prevent it and the owners liability to lienor is not limited to the balance due on the contract price of the building.

Citing: Section 1988, Code of 1858; Shannon's Code, sec. 3544, all editions. (Post, pp. 43-46.)

17. MECHANIC'S LIEN. LIABILITY OF OWNER.

The owner is liable for the full amount of the lien claims unless a sufficient amount of the contract price of the building previously paid by the owner can be traced directly into the hands of the lienors, which amount, with the total lien claims added thereto, exceeds the contract price. (Post, pp. 43-46.)

Citing: Richardson v. Lanius, 150 Tenn. (23 Thomp.), 133; Cole Manufacturing Co. v. Falls, 90 Tenn. (6 Pick.), 466.

18. MECHANIC'S LIEN. EVIDENCE. BURDEN OF PROOF.

The burden is on the owner to show that the amount which has been paid to the contractor was by him in turn paid to the lienors or to others for labor and material furnished in the construction of the building—evidence in this case insufficient to overcome burden. (Post, p. 46.)

19. MECHANIC'S LIEN. COST.

In a suit to enforce a mechanic's lien it is not error to charge the cost against the owner (the defendant) where such owner raises the question of a judgment over against the surety on the contractor's bond for the first time in this court. (Post, p. 49.)

## 20. MECHANIC'S LIEN. PRINCIPAL AND SURETY. PRACTICE AND PROCEDURE.

In a suit by lienors against the owner, the contractor and the surety on the contractor's bond, which bond contains provisions apparently making the obligation of the surety dependent upon written notice of default and containing other conditions which could not have been developed under the pleadings in the pending suit, a judgment in favor of the owner and against the surety is not justified. (Post, p. 49.)

## 21. INDEMNITY BOND.

A bond executed under our mechanic's lien statute clearly implies that the right of recovery on a bond in the terms of the statute does not accrue until after satisfaction of the lien. (Post, p. 52.)

Citing: Shannon's Code, Sec. 3542 (all editions).

## 22. INDEMNITY BOND. COST.

Cost adjudged against the owner in an action brought to establish and fix liens for labor and material furnished in the construction of a building, are included in the penalty of the contractor's bond unless expressly excluded. (Post, p. 52.)

---

*Headnotes 1. Certiorari, 11 C. J., section 341; 2. Corporations, 14a C. J., section 3979; 3. Corporations, 14a C. J., section 3977; 4. Corporations, 14a C. J., section 3979; 5. Corporations, 14a C. J., section 4018; 6. Corporations, 14a C. J., section 3981 (Anno); 7. Corporations, 14a C. J., section 3979; 8. Corporations, 14a C. J., section 3981 (Anno); 9. Corporations, 14a C. J., section 3979; 10. Corporations, 14a C. J., section 3979; 11. Corporations, 14a C. J., section 3992; 12. Licenses, 37 C. J., section 75; 13. Licenses, 37 C. J., section 66; 14. Mechanics' Liens, 40 C. J., section 485 (Anno); 15. Mechanics' Liens, 40 C. J., section 165; 16. Mechanics' Liens, 40 C. J., sections 163, 164; 17. Mechanics' Liens, 40 C. J., section 654; 18. Mechanics' Liens, 40 C. J., section 689; 19. Mechanics' Liens, 40 C. J., section 777; 20. Appeal and Error, 3 C. J., section 786; 21. Mechanics' Liens, 40 C. J., section 730; 22. Mechanics' Liens, 40 C. J., section 485; 23. Mechanics' Liens, 40 C. J., section 487.

---

## FROM WASHINGTON.

---

Appeal from the Chancery Court of Washington County.—HON. HAL H. HAYNES, Chancellor.

COX & TAYLOR, SELLS, SIMMONDS & BOWMAN, MILLER & WINSTON, S. E. MILLER and O. L. WHITE, for complainant.

MILLER, DEPEW & LEE and JAS. J. McLAUGHLIN, for defendant.

MR. JUSTICE SWIGGART delivered the opinion of the Court.

The Johnson City Hotel Company made a contract with E. W. Minter Company, Incorporated, for the construction of a hotel building at Johnson City, known as the John Sevier Hotel. The original contract price was approximately $450,000, to which extras were added, making the total in excess of $500,000.

Upon the completion of the hotel a number of suits were filed by subcontractors of the E. W. Minter Company, including furnishers of both materials and labor, seeking to perfect liens upon the hotel property for the materials and labor furnished. Other suits were filed by unsecured creditors of the E. W. Minter Company, seeking to attach, in the hands of the hotel company, the retained percentage of the contract price. In all, there were seventeen suits, which were consolidated in the chancery court.

As the consolidated causes are presented to this court, the principal contest is made by certain unsecured creditors against the lien claimants, the purpose of which is to defeat the lien claims in order that the retained percentage may be available for the payment of the unsecured debts. In each of the causes, which are involved here, the Massachusetts Bonding & Insurance Company

was made a party defendant, as the surety on the building contract of the E. W. Minter Company with the Hotel Company, the complainants, claiming liens, seeking to have the Bonding Company respond to the extent that the lien recoveries exceed the amount of the retained percentage of the contract price in the hands of the hotel company.

Petition for *certiorari* was filed in this court by unsecured creditors, the Richmond Screw Anchor Company, the Patent Scaffolding Company and Elwyn E. Seelye, to review the decree of the Court of Appeals sustaining the claims of the lien creditors.

Petition for *certiorari* was filed in this court by the Hotel Company to review the decree of the Court of Appeals in holding it liable to the lien creditors for any sum in excess of the retained percentage.

Petition for *certiorari* was filed by the Massachusetts Bonding & Insurance Company to review the decree of the Court of Appeals in sustaining the several liens. This petition also contends that the Chancellor and Court of Appeals were in error in rendering any decree against it in the present causes, regardless of the merits of the lien claims against the hotel company.

Each of these petitions has heretofore been granted, and oral argument has been heard at the bar of the court by counsel for all parties.

The foregoing is a general statement of the causes, without reference to certain minor contentions of the several parties, all of which will more particularly appear herein below.

The petition of the unsecured creditors is directed at the decree of the Court of Appeals sustaining the lien claims of three foreign corporations, the Cornell Company, W. A. Burkard Company and the Roanoke Vi-

trolite & Marble Works, on the ground that their several claims arose out of business transacted in Tennessee while each of them was doing business in Tennessee as a foreign corporation without complying with the laws of Tennessee providing for the domestication of foreign corporations.

These corporations replied that their several claims arose from transactions amounting to interstate commerce, within the protection of the interstate commerce clause of the Constitution of the United States, and also that each of them came to Tennessee to execute a contract entered into elsewhere, with no intention to carry on its business in Tennessee; that the business done by it in Tennessee was an isolated transaction, to perform which the laws of Tennessee did not require it to domesticate.

The Court of Appeals sustained the contention of these corporations that they were not doing business in Tennessee to the extent that they were required to domesticate, but held that their several transactions in Tennessee were not interstate commerce nor within the protection of the interstate commerce powers of the Federal government.

(1) No petition for *certiorari* was filed by the three foreign corporations, and we are, therefore, without jurisdiction to review the action of the Court of Appeals in overruling their several claims that they were engaged solely in an interstate commerce transaction. *Brown v. Brown,* 155 Tenn., 530, 296 S. W., 356, 360, and cases there cited.

The Chancellor made a reference to the clerk and master for a report as to whether these corporations, and others, had transacted business in Tennessee in violation of the domestication laws. The clerk and master reported in the negative, and his report was concurred in by the Chancellor. The Court of Appeals held that this

was a concurrent finding binding upon it, if supported by any material evidence. This holding is attacked, on the ground that whether the foreign corporations involved were transacting business which the statutes of Tennessee made unlawful because the several corporations have not domesticated, was a question of law and not a question of fact.

We do not think the determination of this contention is material or necessary in the present cause, for the reason that the evidence presents no controversy of fact as to the nature or extent of the business transacted in Tennessee by each of the three foreign corporations; and the effect of the action of the Court of Appeals is that, in its opinion, the business transacted by the several foreign corporations in Tennessee, as shown by the undisputed evidence, was not in violation of the statutes of Tennessee.

(2) The contention of the unsecured creditors relied upon to defeat the lien claimants is not a defense in which they have a property interest. They invoke the public policy of the State, to repel the lien claimants from the courts of the State on the ground that their several claims arose out of their own violation of the laws of the State. The proposition is stated in *Cary-Lombard Lumber Co.* v. *Thomas,* 92 Tenn., 587, 594, as follows:

"The Courts will deny any relief upon any illegal contract or transaction, whenever the illegality is made to appear, whether in the pleadings or proof, and will repel the party guilty of the illegality from the Court whenever the fact appears."

Before undertaking to set out in detail the evidence as to the business transacted by each of the corporations, we deem it proper to determine what business transacted in Tennessee by noncomplying foreign corporations is made unlawful.

Acts 1877, chapter 31, was the original statute of Tennessee on this subject. It authorized foreign corporations organized for the purpose of mining, quarrying or manufacturing, and similar purposes, to "carry on" the business of their respective charters in Tennessee, upon filing a copy of such charters with the Secretary of State, and otherwise complying with the terms of the statute.

Section 7 of that statute required any such corporation entering the State to "in good faith continue" its corporate business in the State, and declared the chief purpose of the statute to be "to secure the opening and development of the mineral resources of the State, and to facilitate the introduction of foreign capital."

Section 2 of this statute of 1877 required that each such foreign corporation "desiring to carry on its business in this State, must file in the office of the Secretary of State, a copy of its charter or articles of association," etc.

The Acts of 1891, chapter 122, amended the Acts of 1877, chapter 31, by extending its provisions to include all corporations organized under the laws of another State or country "which may desire to do any kind of business in this State."

Section 2 of this statute provided that any such corporation "desiring to own property or carry on business in this state of any kind or character, shall first file in the office of the Secretary of State a copy of its charter," etc.

Section 3 of this amendatory statute is as follows:

"That it shall be unlawful for any foreign corporation to do or attempt to do any business or to own or to acquire any property in this State without having first complied with the provisions of this Act, and a violation of this statute shall subject the offender to a fine of not

less than $100 nor more than $500, at the discretion of the jury trying the case.''

The third and last enactment of the legislature is Acts 1895, chapter 81, amending Acts 1891, chapter 122.

By section 1 of this statute the previous statute is made to provide that any foreign corporation ''desiring to own property, or carry on business in this State of any kind or character,'' shall first file a copy of its charter in the office of the Secretary of State; and section 3 of the Acts of 1891, above quoted, was amended so as to read as follows:

''That it shall be unlawful for any foreign corporation to do business, or attempt to do business, in this State without first having complied with the provisions of this Act, and a violation of this statute shall subject the offender to a fine of not less than $100 nor more than $500, in the discretion of the jury trying the case.''

(3) By the amendment of 1895 the penal clause was changed so as to permit a noncomplying foreign corporation to own or acquire property in the State without incurring the penalty. *Louisville Property Co.* v. *Nashville,* 114 Tenn., 213, 219.

By section 3 of the Acts of 1891 the penalty was imposed upon a noncomplying foreign corporation who should ''do or attempt to do *any* business.'' As amended the provision is that the penalty is incurred by a noncomplying foreign corporation who shall ''do business, or attempt to do business, in this state.''

(4) By the amendment of 1895, as construed in *Louisville Property Co.* v. *Nashville, supra,* the Legislature manifested very clearly an intention not to require domestication as a condition to the entry of a foreign corporation into the State for all purposes; but to confine the prohibition to such corporations who should undertake to do business in the State.

Both the Act of 1895 and the Act of 1891 are express amendments of the original Act of 1877, and nothing in the two amendments is inconsistent with the declaration of the Legislature in the original act that one of its chief objects was "to secure the opening and development of the mineral resources of the State, and to facilitate the introduction of foreign capital."

The penal clause of our statute is a part of the legislation enacted to accomplish the purpose thus stated. Its meaning and application should not be arrived at, without considering it in its relation to the legislation of which it is a part. Obviously the penal clause was enacted in aid of the requirement of the preceding section, that every foreign corporation "desiring to own property, or carry on business in this State of any kind or character," shall first comply with the several requirements of domestication.

(5) We think the legislative intent was to penalize a foreign corporation who should attempt "to carry on business in this State" in such a way as to entitle it to the privileges of domestication, without first complying with the terms and conditions of the statute.

Referring to the provisions of section 7 of the Acts of 1877, chapter 31, it may be doubted whether a foreign corporation is entitled to domestication unless, at least, it does so with the intention "to commence in good faith to develop and work some portion of its property within this State within one year," and "in good faith continue the same."

(6) In *Cooper Mfg. Co.* v. *Ferguson,* 113 U. S., 727, 28 L. Ed., 1137, the court had before it for construction the constitutional and statutory provision of the State of Colorado, forbidding a foreign corporation from "doing any business" in the State, without one or more known places of business, and an authorized agent or agents in

the same, upon whom process might be served, and without otherwise complying with the terms of the statute. The Supreme Court construed the constitution and statute as applicable to corporations "carrying on" their business within the State, defining the term "to carry on," as conducting, managing or continuing a business or trade. The court then said:

"The obvious construction, therefore, of the Constitution and the Statute is, that no foreign corporation shall begin any business in the State, with the purpose of pursuing or carrying it on, until it has filed a certificate designating the principal place where the business of the corporation is to be carried on in the State, and naming an authorized agent, residing at such principal place of business, on whom process may be served. To require such a certificate as a prerequisite to the doing of a single act of business, when there was no purpose to do any other business or have a place of business in the State, would be unreasonable and incongruous."

While we do not find an express holding in the previous decisions of this court construing and interpreting the provisions of our statutes, the clear intimation of such decisions is that the true and proper construction of our statutes on this subject is in accord with the construction made of the Colorado Constitution and Statutes in the quotation just made from *Cooper Mfg. Co. v. Ferguson. Davis & Rankin Co. v. Caigle* (Chy. App.), 53 S. W., 240; *Cary-Lombard Lumber Co. v. Thomas,* 92 Tenn., 587.; *Milan Milling Co. v. Gorten,* 93 Tenn., 590; *New York, etc., B. & L. Association v. Cannon,* 99 Tenn., 345; *Gilmer v. Savings & Loan Co.,* 103 Tenn., 272; *Harris v. Water & Light Co.,* 108 Tenn., 246; *Lumber Co. v. Moore,* 126 Tenn., 313; *I. J. Cooper Rubber Co. v. Johnson,* 133 Tenn., 562; *Amusement Co. v. Albert,* 128 Tenn., 429; *Peck-Williamson Heating & Ventilating Co. v. Mc-*

*Knight & Merz,* 140 Tenn., 563; *Lloyd Thomas Co.* v. *Grosvenor,* 144 Tenn., 347; *National Plastic Relief Co.* v. *Signal Amusement Co.,* 151 Tenn., 235; *Lummus Cotton Gin Co.* v. *Arnold,* 151 Tenn., 540.

In the early cases, included in the citation just made, the extent of the business transacted in Tennessee by the foreign corporations involved was not expressly referred to, but in each case it very clearly appears from the opinion that the transaction under consideration by the court was a part of a regular business carried on in Tennessee by the corporation.

The first direct reference to be found in our cases, to the extent of the business which a foreign corporation cannot lawfully do in Tennessee, without qualifying, appears in a *dictum* in *Davis & Rankin Co.* v. *Caigle,* 53 S. W., 240, as follows:

"Besides this, for the purpose of erecting a single plant, it was not necessary that any abstract (of the charter) should have been filed. *Milling Co.* v. *Gorten,* 93 Tenn., 590, 27 S. W., 971."

In *Harris* v. *Water & Light Co.,* 108 Tenn., 246, the noncomplying foreign corporation was doing business in Tennessee, as a member of a partnership, "located and doing business in Columbia, in this State." Holding that the partnership, of which the corporation was a member, could not maintain a suit in the courts of the State, the court said:

"The Acts in question have been the subject of frequent examination and application by this Court, and it may be taken as the settled rule that where a foreign corporation comes into this State and establishes itself, carrying on business in disregard of the provisions of these Acts, that its contracts, made in such business, will not be enforced. Many cases will be found in our Reports, directly or by necessary implication, announcing this rule."

The language just quoted was quoted and applied by this court in *Lumber Company* v. *Moore,* 126 Tenn., 313, wherein this court held that a foreign corporation, engaged in the business of buying and selling lumber, was not in violation of the Tennessee Domestication Statutes, when it maintained in Tennessee an office for the prosecution of its ordinary business in adjoining states. The court said:

"Unless the agency in Memphis was maintained for the general prosecution of the company's ordinary business within this State, then the maintenance of such agency did not constitute a doing of business within the State within the meaning of the statutes."

In that case the evidence disclosed that the foreign corporation had participated "in two or three isolated transactions" of purchasing lumber in Tennessee, through the Memphis agency, but the court held that "such business as it did within the limits of this State did not bring it within the provisions of our statutes respecting foreign corporations."

In *Amusement Co.* v. *Albert,* 128 Tenn., 417, the court held that the foreign corporation was engaged in prosecuting its ordinary business within the State. While not expressly so holding, the opinion justifies the inference that the court had it in mind that a single transaction would not have been sufficient to bring the foreign corporation within the statute. The court quoted from *Lumber Co.* v. *Moore, supra,* as follows:

"These prohibitions are leveled against the act of foreign corporations entering the domestic State by their agents or engaging in the general prosecution of their ordinary business therein, and they do not apply therefore to acts not constituting any part of their ordinary business."

156 Tenn.—3.

In *Peck-Williamson Heating & Ventilating Co.* v. *Mc-Knight & Merz,* 140 Tenn., 563, after holding that the business of the foreign corporation was not limited to interstate commerce, the court held that the business of the corporation in Tennessee was not limited to isolated transactions, finding that the corporation had on, at least, five different occasions, in 1912, 1913 and 1914, engaged in the same kind of transactions in Tennessee as that involved in the case before the court. The transaction before the court was also in 1913. The court did not disapprove the "isolated transaction" rule, but said: "So that it appears the transaction we are now examining was not an isolated one, and therefore the question of law suggested need not be considered."

In *Lloyd Thomas Co.* v. *Grosvenor,* 144 Tenn., 347, the court reached the conclusion that the foreign corporation had not transacted business in Tennessee because it had engaged only in acts of interstate commerce, but in that case the court said:

"The statutes respecting the terms upon which foreign corporations may do business in the State were passed as a matter of public policy, not so much for the benefit of the parties sued, as in the interest of the people at large.

"A corporation is doing business in a State when it transacts therein some substantial portion of its ordinary business, continuous in character as distinguished from merely casual or occasional transactions. *Amusement Co.* v. *Albert,* 128 Tenn., 417, 161 S. W., 488."

The case of *National Plastic Relief Co.* v. *Signal Amusement Co.,* 151 Tenn., 235, can hardly be treated as an authority on the particular proposition now under discussion, for the reason that the decision of the court was controlled by the pleadings, involving an implied admission or concession of the complainant corporation.

In *Lummus Cotton Gin Co.* v. *Arnold,* 151 Tenn., 540, the court apparently recognized that a casual or occasional transaction of its business within the State by a noncomplying foreign corporation, was not unlawful. *Amusement Co.* v. *Albert, supra,* was referred to as holding that a foreign corporation is doing business within the State when it transacts therein some substantial part of its ordinary business, and its operations within the State do not consist of mere casual or occasional transactions. The court then found from the evidence that, in addition to the transaction involved in the particular case, the complainant corporation maintained a branch office in the State, from which it carried on other and similar business transactions in the State, all of which constituted "the prosecution of a material portion of its ordinary business in this State."

In our opinion, the penal clause of the Act of 1891, as amended by the Act of 1895, is applicable only to a noncomplying foreign corporation which transacts, or intends to transact, within the State some substantial portion of its ordinary business, continuous in character, as distinguished from merely casual or occasional transactions. The intention to continue the business in the State may be inferred from a single transaction, when the circumstances justify it.

We are further of the opinion that in view of the definitions of the term "doing business," which appear in the more recent opinions above referred to, a sound and equitable public policy would forbid the court from now construing the statute as penalizing a noncomplying foreign corporation for a single transaction of its ordinary business within the State, unaccompanied by any evidence of an intention on the part of the corporation to continue its business in the State.

In the case of each of the three foreign corporations, the Cornell Company, the W. A. Burkard Company

and the Roanoke Vitrolite & Marble Works, it appears that a contract was made without the State for the furnishing of materials and the installation thereof in the John Sevier Hotel. There is no evidence of an intention on the part of any of said corporations to transact any other business in Tennessee, or to continue therein after the completion of the one building referred to in their contracts. It is our opinion that the execution of each of these contracts in Tennessee was a single and isolated transaction, which did not bring the corporations within the application of our foreign corporation statutes.

(7) It appears that the construction of the building required more than twelve months, and the Burkard Company, electricians, were working on their contract in Tennessee during this entire period. The other two corporations required shorter periods for the completion of the work called for in their contracts. We do not think that the length of time required for the construction of the building can change the result. The time required to execute a contract in Tennessee may, in proper cases, be treated as evidence of an intention to carry on a business, which would bring a foreign corporation within the application of our statutes; but under the facts of the present causes, when the contracts called for materials and work in a single building, we are satisfied that the length of time required to complete the building should not be regarded as the test of the application or nonapplication of the statutes.

(8) It further appears from the evidence that, at least, two of the three corporations, entered into agreements with the E. W. Minter Company for certain extra materials and labor for the building; and one of the corporations entered into and executed an agreement with the owner of the hotel for certain extra materials and labor. These additional contracts were entered into in Tennes-

see while the work of the original subcontracts was being carried on.

The Court of Appeals reached the conclusion that these extra contracts were merely supplemental to and incidental to the principal transaction, and did not constitute a doing of business within the State, within the application of the domestication statutes. Inasmuch as the extra contracts and work were confined to the same building involved in the original contracts, we agree with the conclusion of the Court of Appeals on this point.

(9) It was further shown that the Cornell Company paid State, county and city privilege taxes while engaged in its work on the hotel building, and this is relied upon as evidence of an intention to carry on its business continuously within the State. The payment of a privilege tax may be evidence of such an intention, but not conclusive evidence. (10) A foreign corporation engaged in a single business transaction in the State, so as not to be within the application of the domestication statutes, may nevertheless be exercising a taxable privilege.

The Court of Appeals found that the payment of this privilege tax was a precaution against violating the State revenue laws, and we are not able to find anything in the fact to change the result above indicated.

(10a) Neither is the fact that the Roanoke Vitrolite & Marble Works engaged in a similar action in Tennessee some years before the transaction here involved, sufficient to change the result as to it.

The Chancellor and the Court of Appeals found that there was no connection between the two transactions, and there is no evidence to the contrary.

(11) The case of a fourth corporation, the Herzog Iron Works, presents a different state of facts. That company entered into a contract in New York, whereby it agreed to furnish material, composed of iron and fab-

ricated steel, for the hotel building and to install the same.

The material was shipped by railroad from St. Paul, Minnesota. The first shipment was made from St. Paul in September 1923, and on February 15, 1924, the corporation complied with our statutes by filing a copy of its charter with the Secretary of State, and paying the fees exacted of it. The record does not affirmatively show that any of the material reached Tennessee prior to the date of domestication, but it was shown that the transportation ordinarily required about one month, from which it may be inferred that some of the material was delivered in Tennessee prior to the date of domestication. With regard to its claim the Court of Appeals said:

"With reference to this company, there is also a concurrent finding of the master and Chancellor that this company was not doing business in this State within the meaning of our statute. . . . As far as this finding related to the feature of interstate commerce, it was, and is, that the actual work on the ground did not begin until after April 15, 1924; that nothing had been done toward it except the shipment of materials in from outside the State; that the contract was made outside of the State."

We accept the foregoing as a finding of fact that the contract of the Herzog Iron Works was made outside of Tennessee, and that prior to its domestication it had done nothing toward the execution of the contract in Tennessee, except to ship some of the material from Minnesota to this State. We are not referred to any evidence to the contrary.

The case as to this corporation may be distinguished from the facts involved in the case of *Kansas City Structural Steel Co.* v. *State of Arkansas*, 269 U. S., 148, 70

L. Ed., 204, by the finding that the contract was not made in Tennessee.

The question for our determination is, therefore, whether a foreign corporation, having entered into a contract calling for the performance of certain acts of intrastate business within the State, and having shipped certain materials to the State in interstate commerce, has violated the Tennessee foreign corporation statutes, when it has met all the requirements of the statutes prior to its actual entry into the State for the purpose of performing the intrastate features of its contract. We answer this in the negative, being unable to point out any act of the corporation done within the State prior to its qualification, which would subject it to the penalty defined in section 3 of the Acts of 1891, as amended.

The Chancellor and the Court of Appeals sustained the lien claim of William Nestor, executor of the will of William Schaffer. The claim is for Schaffer's compensation for his services rendered as an "interior decorator."

(12) Assignments of error are filed by the unsecured creditors and the Massachusetts Bonding & Insurance Company, on the ground that Schaffer's claim cannot be enforced because, at the time he did his work, he had not paid the privilege tax levied by the Revenue Act of 1923, Chapter 75. This tax is levied on a number of enumerated occupations, all of which fall under the generic term "mechanics." Among those specified as subject to the tax are "asbestos workers, brick layers, plasterers, structural iron workers, elevator constructors, lathers, sheet metal workers, painters," etc.

It is contended that the work done by Schaffer was that of a "painter," and that he was, therefore, liable to pay this privilege tax.

In overruling the attack on this claim the Court of Appeals said:

"We are satisfied that in the term 'painters,' the Legislature meant only to comprehend that character of employment by all who essay the ordinary employment of brush and paint as a business, and commonly denominated as painters, with skill sufficient for the ordinary job. In this case, as we think authorizedly found by the master and Chancellor, William Schaffer was an interior decorator, and the nature of his work was such that it required extraordinary skill and talent to do it; and while no doubt brush and paint was used, the work was of such a nature as to acquire the designation of decoration, involving a degree of talent and skill not usually possessed or required of the ordinary painter, and which we think would put it in a class by itself, not comprehended by the term 'painter' as used by our statute."

We concur with the Court of Appeals in this construction of the statute. The context shows clearly that the privilege tax was intended to be levied upon a class of artisans or mechanics, and not upon one whose employment depended upon the possession and exercise of an unusual skill or talent, characterizing his work as one of decoration rather than of utility. It would hardly be contended that an artist, employing his brush and paints in portraiture, would fall within the class of painters, as the term is used in the revenue statute above referred to. Such a statute is construed strictly against the State.

(13) The Massachusetts Bonding & Insurance Company also assigns error to the action of the Court of Appeals in increasing the decree awarded the Roanoke Vitrolite & Marble Company in the sum of $284.60, and interest thereon.

The action of the Court of Appeals in this regard was upon a finding that the clerk and master had found the increased sum as the correct amount due this claimant, but by a clerical error the smaller sum had been reported and concurred in by the Chancellor.

The clerk and master intended to report the amount stated in the deposition of E. W. Minter as the amount he and the claimant had agreed upon. The statement of Mr. Minter in his deposition as to the amount is confused and ambiguous. A reference to the deposition convinces us that the clerk and master may have construed his statement to mean that the smaller sum reported was the amount agreed upon, there having been a dispute or controversy with regard to the additional item of $284.60, which Mr. Minter testified was not properly included in the lien claim. This being true, we are unable to agree with the Court of Appeals that the smaller sum decreed by the Chancellor was the result of an inadvertence or clerical error. We find it necessary, therefore, to modify the decree of the Court of Appeals on this item, and direct that the amount fixed by the Chancellor should be reinstated.

*(14)* With reference to the lien claims of the Candoro Marble Works, Miller Brothers Company, S. B. White, and Western Waterproofing Company, the Massachusetts Bonding & Insurance Company assigns as error that the Court of Appeals erred in holding it bound by the action of the hotel company, the owner, in fixing an erroneous date as the date of the completion of the building.

The materiality of this contention lies in the fact that the lien notice of, at least, some of these claimants was given *prematurely,* unless the owner was estopped from making the question because of a notice given by it to

all lien creditors, that the building had been completed on the date named therein; whereas, in fact, the Chancellor and clerk and master concurred in finding that the true date of completion was a number of weeks later.

The Court of Appeals held that these lien claimants had been induced to give notice that a lien was claimed on the date of the respective notices, by reason of the representation of the Hotel Company as to the date of completion, and that an estoppel resulted against both the Hotel Company and the Massachusetts Bonding & Insurance Company, as surety.

The action of the Hotel Company did not result in the waiving of any defense, which then existed, to the fixing of liens. Without the notice given by the Hotel Company the lien claimants could have perfected their liens by notice and proper action thereon at an even later date, upon the actual completion of the building. *(15)* Under these circumstances, the finding of the Court of Appeals that the lien was properly perfected, is binding upon the surety, and the assignment of error is overruled.

Consideration of the remaining assignments of error of the Massachusetts Bonding & Insurance Company, as to a clerical error in the amount of the decree rendered against it, and as to the power of the Court of Appeals to render any decree against it under the pleadings of the several parties, will follow disposition of assignments of error made by the Johnson City Hotel Company.

At an early stage of the proceedings in the chancery court in the consolidated causes it appeared expedient to the Johnson City Hotel Company, owner of the John Sevier Hotel, to refinance its funded indebtedness by the execution of a new mortgage or deed of trust on its property, to secure its notes or bonds. It was decided that this new indenture should be secured by a first lien on the

property, and to that end an agreement was entered into with the several lien claimants, whereby the Hotel Company executed a bond in the sum of $150,000, with a number of personal sureties thereon, conditioned to secure the payment of all debts which should be decreed as liens on the property in the consolidated causes. A decree was entered by the Chancellor, by consent, that the bond should "stand in the causes as additional security for the payment of liens which may be adjudged against the property of the Hotel Company, described in the bill; and also for the payment of the amount which may be due by the Johnson City Hotel Company to the E. W. Minter Company, Incorporated, growing out of the construction of said hotel building, by the said E. W. Minter Company, Incorporated."

The decree further provided that any liens adjudged in the causes should be secondary to the mortgage or deed of trust above referred to.

The final decree in the consolidated causes directed that the property be sold subject to the mortgage or deed of trust referred to in the agreement, for the satisfaction of the lien judgments, and that if the lien judgments were not thereby satisfied, execution should issue against the Hotel Company and the sureties on said bond for the balance.

The total amount of the lien judgments decreed by the Chancellor and Court of Appeals, and sustained hereinabove, is approximately $100,000. The Hotel Company withheld from its contractor, E. W. Minter Company, Incorporated, as a retained percentage of the contract price, approximately $75,000, augmented by interest at the date of the final decree to something over $80,000.

(16-17) By its first and second assignments of error the Hotel Company, for itself and the sureties on its said

bond, contends that the Chancellor and Court of Appeals should not have rendered a decree against it and its sureties for any sum in excess of the said retained percentage, principal and interest.

This contention of the Hotel Company is rested primarily upon a provision of the lien law, Code of 1858, section 1988, Shannon's Code (all editions), section 3544 as follows:

"The claims thus secured by lien for work and labor done, and materials furnished, shall in no case exceed the amount agreed to be paid by the owner or proprietor in his original contract with the undertaker."

It is first contended for the Hotel Company that the various lien claimants, who are subcontractors under the E. W. Minter Company, are charged with notice of the provisions of the Hotel Company's contract with the Minter Company; that the contract called for monthly payments on the contract during the continuance of the work, measured by estimates as to the progress of the construction; that payments made according to the contract were, therefore, with the consent of the various subcontractors and lien claimants, with the result that they could not collectively enforce liens in an aggregate amount which would exceed the percentage of the contract price retained by the owner for the mutual protection of itself and the lien claimants.

We are not able to agree with this contention. While the subcontractors are chargeable with notice of the terms and provisions of the original contract, and were bound to make the materials and labor furnished by them conform to the original contract, the fundamental purpose of the lien law is to enable them to look to the property itself for a satisfaction of their lien debts, in the event they should not be paid by the prin-

cipal contractor or by the owner, and this is true regardless of whether the owner may have paid to his contractor the entire amount of the contract price.

The true meaning and construction of the limitation contained in section 1988 of the Code of 1858 (Shannon's Code, section 3544), quoted above, appear in the opinion of this court in *Richardson* v. *Lanius,* 150 Tenn., 133.

It was certainly not held in *Richardson* v. *Lanius, supra,* that in no event could the proper enforcement of the lien law result in the owner being required to pay more for his building than he had contracted to pay. The court referred approvingly to the case of *Cole Manufacturing Co.* v. *Falls,* 90 Tenn., 466, 16 S. W., 1045, as holding that the lien law "places the owner in such a position that he may be subjected to double payment, unless he exercise reasonable care and caution to prevent it."

In *Cole Manufacturing Co.* v. *Falls, supra,* the court further said: "The second criticism, involving the proposition that the owner *may* be compelled to pay the subcontractor and materialman after he has already paid the original contractor, is true literally."

The gist of the holding in *Richardson* v. *Lanius,* is to be found in the sentence contained in the opinion: "The total *liens* could not have exceeded the contract price." (Italics ours). In that case all the money previously paid by the owner had been paid by him directly to furnishers of labor and material who were granted liens by the statute; and the court held no more than that the previous voluntary payments by the owner to the holders of liens should be added to the amount of the lien proven by the complainant, and if that total exceeded the contract price, then complainant could only enforce his lien in the *pro rata* amount which would have awarded him if all of the lien holders had been forced to join

him in his suit. The court said: "If all had been forced to sue, they would have gotten only their *pro rata* part. Some were not forced to sue, but this did not prejudice complainant. He still has his right to a lien for his *pro rata,* and, therefore, has lost nothing."

We hold, therefore, that the lien claimants in these consolidated causes are entitled to enforce their lien claims in full, unless a sufficient amount of the contract price previously paid by the Hotel Company can be directly traced into the hands of furnishers of materials and labor entitled to liens, which amount, with the total lien claims added thereto, will exceed the contract price.

In *Cole Manufacturing Co.* v. *Falls, supra,* the court said:

"In every instance the owner may fully protect himself by withholding the whole or a sufficiency of the price agreed upon from the original contractor until after the expiration of the thirty days, or he may see to it that the subcontractor and materialman are paid as the work progresses, or he may indemnify himself by bond, as prescribed in the third section of this Act."

(18) The Hotel Company further insists that the record discloses that the entire contract price, except the retained percentage in its hands, was paid to holders of liens, and that, therefore, it is within the rule of *Richardson* v. *Lanius, supra.*

In this contention we think the burden of proof is clearly upon the owner. The limitation that the liens claimed shall in no case exceed the contract price is not a part of the definition of the rights conferred by the statute upon furnishers of labor and material, but is a limitation upon the enforcement of such rights, which may be relied upon by the owner of the property as a defense. The application of that part of the contract price previously

paid by the owner is a matter within the knowledge of the owner and his principal contractor, and, the sub-contractor or laborer will have no means of proving the facts. We cannot hold that, in order to enforce a lien for work or material furnished, the lien claimant must prove affirmatively that the owner of the property, upon which the lien is sought to be fixed, has not already paid out the entire contract price in the satisfaction of lienable claims.

The Court of Appeals held that the Hotel Company had not carried the burden of proving that its payments to the principal contractor had gone into the hands of lien holders, and we concur in that holding.

The contract price, with extras agreed upon, was in excess of $500,000, of which approximately $450,000 was paid by the Hotel Company to the principal contractor. The testimony of officers of that company is that after about $8,000 had been paid directly to the principal contractor on the first two monthly estimates, the Hotel Company undertook to see that all money paid to the principal contractor was checked out by it to furnishers of materials and labor. No detailed evidence was offered, but the officers testified that they examined the records of the superintendent of the principal contractor, and of the architect, and saw to it that the money paid to the contractor was expended in the satisfaction of the lienable debts.

It is, to say the least, doubtful whether the Chancellor would have been authorized in accepting the judgment of the officers of the Hotel Company as to whether the debts paid by it were, in fact, debts protected by the lien law, without sufficient evidence of the nature of the several debts to make a prima-facie showing that they were lienable debts.

The president of the Hotel Company testified that in the early part of the construction the contractor borrowed money from local banks, on a letter from the Hotel Company that the amount of the loans would be deducted from the payments due the contractor. He further testified: "But we knew that that was about as unsatisfactory as paying him direct, so we discontinued that pretty early in the construction." This witness further testified that Minter borrowed no money from local banks, except upon the authority of the Hotel Company, so far as he knew, and that the Hotel Company repaid each such loan; that the money borrowed went to pay lienable claims.

Mr. Minter, however, testified that in the early stages of the contract he borrowed from local banks between $100,000 and $150,000. When he was asked whether the Hotel Company repaid these loans, he replied: "On the last payment they did. Before we paid every time." He then testified that if the Hotel Company paid the banks $140,000 for loans made to him, he himself had paid the bank $120,000 with money he had received from the Hotel Company. No effort appears to have been made to have Mr. Minter testify that all the money received by him from the Hotel Company was used to satisfy lienable claims.

We agree with the Court of Appeals that the evidence is wholly insufficient to trace enough of the payments made by the Hotel Company into the hands of lien holders. The Court of Appeals was, therefore, not in error in rendering its decree against the Hotel Company and the sureties on its bond for the total amount of the liens proven by the several complainants, without reference to the amount of the retained percentage of the contract price in the hands of the Hotel Company.

*(19)* The third and remaining assignment of error of the Hotel Company is that the Court of Appeals erred in adjudging any of the costs of the causes against it, "unless there were judgment over against the surety on the construction bond."

The Hotel Company resisted the lien claimants in their efforts to perfect their respective liens throughout the litigation. In this court, while the Hotel Company has not filed assignments of error to the action of the Court of Appeals in sustaining the several liens, it has filed briefs expressly adopting the contentions of the Bonding & Insurance Company in opposition to the liens. In so far as the successful complainants are concerned, therefore, there is clearly no error in the action of the lower court in adjudging costs in their favor and against the Hotel Company.

With respect to the costs adjudged in the chancery court, it appears that the Hotel Company made no assignments of error in the Court of Appeals that the Chancellor had abused his discretion in the disposition of the costs.

We further find from the record that the Hotel Company did not ask the Chancellor or the Court of Appeals to render "judgment over" against the Massachusetts Bonding & Insurance Company, for the costs adjudged against the Hotel Company. This contention of the Hotel Company appears to have been urged for the first time in this court, and we are, therefore, without jurisdiction to act upon it. The several assignments of error made for the Hotel Company will, therefore, be overruled.

*(20)* It remains to consider the contention of the Massachusetts Bonding & Insurance Company that the Court of Appeals was in error in rendering any decree aganist

it in favor of the Hotel Company, for the reason that the Hotel Company was a codefendant in the consolidated causes, and filed no pleading seeking affirmative relief in its behalf.

At the time the contract for the construction of the hotel was entered into by the Johnson City Hotel Company with E. W. Minter Company, Incorporated, the latter corporation executed a bond in the sum of $75,000, with the Massachusetts Bonding & Insurance Company as surety, conditioned, among other things, to deliver to the Hotel Company the completed and finished structure "free and discharged of all claims, liens and charges whatsoever." The bond recited that the obligation should be void "if the principal shall indemnify the obligee against any loss or damage directly arising by reason of the failure of the principal to faithfully perform said contract;" otherwise to remain in full force and effect. It contains a clause, inserted by the surety, "that no right of action shall accrue upon or by reason hereof, to or for the use or benefit of any one other than the obligee herein named; that the obligation of the surety is and shall be construed strictly as one of suretyship only."

Having been made a party defendant to the suits instituted by lien claimants, the Bonding & Insurance Company appeared in the consolidated causes and resisted each of the lien claims.

The Chancellor rendered a decree against the Bonding & Insurance Company, as well as against the Minter Company and the Hotel Company, in favor of each of the lien claimants whose lien was sustained; and also decreed that to the extent of the difference between the sum retained by the Hotel Company from the contract price due the Minter Company, and the total amount of the lien claims included in the decree, the Bonding & In-

surance Company was primarily liable, and that for said difference, $17,617.18, "a decree is awarded in favor of said Hotel Company and the sureties on the bond of October 28, 1924, for the use and benefit of the several lien claimants."

The Court of Appeals held that the Chancellor was in error in rendering the primary decree against the Bonding & Insurance Company, in favor of the lien claimants, on the ground that the contract of suretyship was not made with them, or for their benefit, and that the circumstances did not give rise to any right of subrogation. The Court of Appeals, however, sustained the Chancellor in the decree rendered against the Bonding & Insurance Company in favor of the Hotel Company, for the use and benefit of the lien claimants whose liens were sustained by the decree.

There is no assignment of error before this court to the action of the Court of Appeals in reversing that part of the Chancellor's decree which awarded a recovery to the complainants, whose liens were established, against the Bonding & Insurance Company.

In support of its assignment of error, the Massachusetts Bonding & Insurance Company insists that since the Hotel Company, the obligee named in the bond, did not ask for a decree on the bond in its favor, the Bonding & Insurance Company was entitled to assume that the Hotel Company's rights would not be asserted in the present causes, and that it has had no opportunity to assert defenses against any claim of the Hotel Company.; and in the brief of counsel for the Bonding & Insurance Company the statement is made that it has such defenses.

The action of the Court of Appeals was predicated upon exceptions recognized in equity to the general rule that

a decree will not be rendered between codefendants, stated in Gibson's Suits in Chancery, section 560.

We are not able to conclude that the pleadings in the present actions are sufficient to justify a decree on the bond, in favor of the Hotel Company. The bond contains provisions apparently making the obligation of the surety dependent upon written notice of default, within a stated period after default, and contains other conditions which could hardly have been developed under the pleadings in the present causes.

(21) Furthermore, the bond is by its terms an indemnity bond, expressly authorized by section 3542 of Shannon's Code (all editions). This section of the Code provides that "on payment to such subcontractors, mechanic, or furnisher of the amount due, he (the owner) shall have judgment for such amount by motion on such bond in any court having jurisdiction in such cases." This language of the statute clearly implies that the right of recovery on the bond does not accrue until after satisfaction of the liens by payment.

(22) Furthermore, we are of the opinion that it would work an injustice to the Hotel Company to sustain the judgment, nominally in its favor. The costs adjudged against the Hotel Company in the action brought to establish and fix the liens should be included in its recovery on this bond; and if the Hotel Company should be successful in obtaining a judgment on the bond, either by motion in the present causes, or in the separate suit which it has instituted on the bond, the costs adjudged against it herein will properly be added to the amount paid to satisfy the liens.

The foregoing, either expressly or by necessary implication, disposes of each of the assignments of error made by the several petitioners.

It results that the decree of the Court of Appeals in favor of the Hotel Company and against the Massachusetts Bonding & Insurance Company will be reversed. The decree of the Court of Appeals in all other respects will be affirmed, with the single modification reducing the amount of the recovery of the Roanoke Vitrolite & Marble Works, as hereinabove specified.

The costs incident to the several petitions for *certiorari* and the proceedings in this court will be paid, one-half by the Massachusetts Bonding & Insurance Company, and one-half by the unsecured creditors, the Richmond Screw Anchor Company, the Patent Scaffolding Company and Elwyn E. Seelye.