Clara RUDICK, now Clara Rosenberg, Appellant,

v.

PRINEVILLE MEMORIAL HOSPITAL, Denison M. Thomas, M.D., and Charles E. Donley, M.D., Appellees.

No. 18199.

United States Court of Appeals Ninth Circuit.

July 2, 1963.

Alexander H. Schullman and Herbert E. Selwyn, Los Angeles, Cal., and Thomas H. Ryan, Portland, Or., for appellant.

Hugh L. Biggs, George H. Fraser and Cleveland C. Cory, Portland, Or., for appellee Thomas.

Maguire, Shields, Morrison, Bailey & Kester, William H. Morrison, and Winfrid K. Liepe, Portland, Or., for appellee Donley.

Before BARNES, HAMLIN and MERRILL, Circuit Judges.

BARNES, Circuit Judge.

This is a diversity action for malpractice against a hospital and two doctors. 28 U.S.C. § 1332. One doctor (Thomas) was a general practitioner; one (Donley) was an expert in radiology and roentgenology.

Plaintiff below was denied recovery as to either individual defendant, and this appeal follows. 28 U.S.C. § 1291.

Because of the unusual method pursued by appellant's counsel in presenting his legal questions in this case, a fairly extensive resume of the testimony, and more particularly the expert medical testimony presented, is essential to an understanding of the matter.

Appellant was badly injured in an automobile accident occurring near Mitchell, Oregon, on May 25, 1957. She was treated by defendant Dr. Thomas in the emergency room of the Prineville

Memorial Hospital in Prineville, Oregon, on the night of the accident. After debriding and suturing severe scalp lacerations, appellant was taken to an x-ray room. She had complained of pain in the sacral, thoracic and cervical regions of her spine, of pain in her ribs, right shoulder, knee and head. X-rays were taken of her cervical spine, right shoulder, right ribs and pelvis. The x-ray view of the cervical spine was A.-P. only.[1] No lateral view of the cervical spine was taken at that time. Two fractures of ribs in the upper rib cage were discovered.

On May 25, 1957, additional x-rays were ordered of the whole back and upper spine, and were taken on May 28, 1957, including a lateral view of the cervical area.[2] On June 14, 1957, additional x-rays were taken of the ribs. All x-rays material to a diagnosis of cervical injury were read as negative for any fracture or dislocation of the cervical area of the spine.

On June 27, 1957, lateral x-rays of appellant's neck were taken in Long Beach, California, with the neck in extreme flexion (i. e., with head bent forward; Ex. 19). They disclosed a compressed fracture of the sixth cervical vertebrae with a subluxation or dislocation or a sliding forward of the fifth cervical vertebrae on the sixth.

Dr. Thomas testified had he known of the condition of the appellant's neck as disclosed by the June 27, 1957 x-rays, he would *not* have ordered all the physiotherapy he ordered for appellant after her accident (i. e., massage and traction).

Dr. Donley specialized in radiology. He never saw the appellant or treated her, but reported on her x-rays taken at the Prineville Hospital. He took no x-rays himself. The May 25th, 1957, x-rays which he interpreted, showed an A.-P. view of the cervical spine, or part of it, but was not taken for the purpose of showing the cervical spine (Tr. 61). A "proper" x-ray examination of the cervical spine area would have included an oblique view to show pedicules and articulating facets of the cervical spine, and a lateral view to show any evidence of subluxation or compression.

Lateral x-rays of the cervical spine taken on May 28, 1957, by one Dr. O'Daugherty (not a defendant) were interpreted by Dr. Donley as disclosing "no evidence of injury or bony disease." He saw "a small notch in C6 [cervical sixth]" which he interpreted as "a small defect left by the development of the nutrient artery."—"not a significant finding and of no consequence," although it was at the point the later lateral x-rays taken with extreme flexion disclosed a dislocation and fracture.

Dr. Donley testified it was his opinion the ligamentous tear and subluxation of the fifth cervical vertebrae had occurred at the time of appellant's accident, but that the x-rays taken in Oregon disclosed the cervical vertebrae in a reduced position—back in position with normal alignment (Tr. 74).

When appellant went to a Dr. Alban, an orthopedic specialist in Long Beach, California, on June 27, 1957, he ordered x-rays of the cervical spine and the lateral view[3] clearly showed the fracture of the sixth cervical vertebrae and the subluxation of the fifth forward. Dr. Alban then procured the original "Oregon" x-rays of the cervical spine[4] and after referring to them testified:

"I could see the reason why she was not treated as a fracture dislocation because I saw neither a fracture or a dislocation on this film that we got from Oregon." (Tr. 87.)

Appellant was then put into a head halter traction, which produced a "reduction" of the dislocation. A plaster cast

---

1. Plaintiff's Ex. 1, Anterior-Posterior, or front to back.

2. Plaintiff's Ex. 6. (There is some reference to x-rays of May 27th, 1957 (Tr. p. 154), but we assume the May 27 and May 28 x-rays were the second "Oregon" x-rays.)

3. Ex. B attached to Dr. Alban's deposition.

4. Ex. A attached to Dr. Alban's deposition.

of the Minerva type was placed on appellant's body. Because of subsequent dislocation in the cast, Crutchfield tongs were placed on appellant, providing traction on the skull itself.

"Reduction occurred completely. By that I mean we again obtained a film similar to the one that was originally taken in Oregon where the vertebrae appeared one directly over the other.

"Q. As they should be?

"A. As they should be." (Tr. 89.)

In order to preserve this position, a bone graft and stainless steel wire fusion was done for appellant. Solid fusion between the fifth and sixth cervical vertebrae was achieved (Tr. p. 91).

On redirect examination by appellant's attorney, Dr. Alban gave the following testimony:

"Q. Doctor, had this dislocation been discovered immediately after the accident, what would have been the usual type of treatment for it?

"A. Exactly the same as the treatment that we used when we learned of the fractured dislocation here. That is, first, conservatively, meaning without surgery to reduce it. Then try to hold that reduction by either continued traction or by plaster cast or brace. Then if that failed, as we did, the surgical approach on the inside with a fusion.

"Q. What is your opinion about the delay in having followed that procedure and its effect on the patient?

"A. It does not seem to me that the delay in this case caused any harm other than the infliction of a certain amount of distress that the patient felt. Because from the story, she didn't allege that she was any worse when I saw her than she was during her hospital stay.

"Q. And you are just going on what she told you on that?

"A. That is right." (Tr. pp. 100–101.)

The expert testimony produced by the appellant below consisted of Dr. Alban's deposition, as heretofore mentioned, and the testimony of Fred C. Shipps, M.D., an x-ray specialist, Edwin M. Mickel, M.D., a general practitioner, and David S. Stern, M.D., an x-ray specialist.

Dr. Shipps pointed out fractures were sometimes "more obvious" if x-rays were taken two weeks after an injury, rather than three days, and explained why. (Tr. pp. 120–121.) The court asked him a pertinent question, which is set out in the margin.[5]

5. "THE COURT: What I think we would like to know is this: Suppose that you were reading x-rays for the Pioneer Hospital or the Prineville Memorial Hospital in Prineville, Oregon routinely and you saw those x-rays, the ones that you saw first. Would you have directed the attending physician to make more x-rays?

"THE WITNESS: I would hope that I would have. I can't say that I would have actually directed it.

"THE COURT: You don't know whether you would have directed it or not?

"THE WITNESS: I am not positive that I would. I cannot prevent—I have never commenced—

"THE COURT: Was that very permissible conduct there, whether you would or wouldn't?

"THE WITNESS: It has happened here in Portland.

"THE COURT: I suppose it has happened all over the world, but what I am trying to find out, doctor, is: do you think that the failure to order additional x-rays under the circumstances that I gave to you, namely, your reading of the x-rays routinely for the hospital, would constitute negligence?

"THE WITNESS: I would hope not.

"THE COURT: What do you mean, you hope not?

"THE WITNESS: The views—I tried to point out, judge, on the original set of films the findings were very minimal. I could not myself come to a conclusion. It seems like more hunches on here whether or not more films were taken. It is very conceivable that I or any other radiologist could have overlooked those minimal findings and waited for something else outside the x-ray report to have prompted looking at this patient again.

"I believe earlier I pointed out continued trouble on the part of the patient or the consulting doctor coming back and

Dr. Mickel reviewed the x-rays taken on May 25th and 28th, 1957, and found all "within limits of normal" (Tr. p. 155), but "equivocal" (proved out by the June California x-rays). In answer to the hypothetical question, he thought it (a) a good policy not to place a patient in traction (as appellant was) after a single A.-P. cervical x-ray; (b) "that the physiotherapy was a little excessive" —on all things, did "not quite come up to standard" (Tr. p. 166)—"not quite proper." (Tr. p. 167.) He did not blame the x-ray reading ("you couldn't say that he didn't properly read them because they were equivocal") (Tr. p. 166). If the appellant had been treated with a plaster cast originally, "she probably would not need to have [had] an open reduction or surgery" (Tr. p. 168).

Dr. Stern described the Oregon x-rays as "worrisome," and that additional x-rays were indicated to him. When asked to study the x-ray reports made on the Oregon films, he stated he would have made his report differently, but: "everybody has their own way of reporting films, which I guess is the same as any attorney presents a case in a different way. Although he does it differently than I would, this is probably still correct." (Tr. p. 200.)

When asked "whether the practice followed here was proper or improper," the doctor answered: "That is hard to say * * * to miss a fracture happens to everybody * * * just because I do it one way and the other radiologist does it another doesn't mean we are both wrong or both right. We are probably

both right in our own way." (Tr. p. 204.) But he concluded it was "improper" not to point out the "suspicious signs." However, when asked the direct question: "Was there any negligence on the part of the radiologist?", this expert witness answered: "No." (Tr. p. 211), but that the physician in general practice was negligent (Tr. p. 211).

Based on this testimony the court granted a nonsuit as to the radiologist Dr. Donley, and let the case go to the jury as to the general practitioner, Dr. Thomas.

The hospital, originally an appellee on this appeal, was dismissed when counsel for appellant (who did not represent appellant below) became convinced that counsel below had in truth stipulated that the action was to be dismissed as against the hospital, and that this had been done in the court below.

The case went to the jury as to Dr. Thomas' negligence, and the jury returned a verdict in his favor.

■ Appellee first urges us to dismiss this appeal for various failures on the part of the appellant to follow the rules of this court in filing his brief. There was no certificate attached (Rule 18, subd. 2(g)); no table of exhibits (Rule 18, subd. 2(f)); no summary of argument (Rule 18, subd. 2(e)); and improper specification of errors (Rule 18, subd. 2(d)). But rather than permitting the omissions of counsel to prejudice the rights of litigants, we have considered all of appellant's points, and decline to dismiss this appeal on the technical

saying, 'Take another look. This patient is too sick.'
"THE COURT: Absent diagnosis or communication from the doctor, you probably would have let it pass?
"THE WITNESS: I might have, yes.
"THE COURT: Well, would you probably have asked for additional x-rays, or would you probably have waited?
"THE WITNESS: Lets put it this way: had I seen it, I would have asked for additional x-rays, but it is possible that I would have overlooked it myself, routine work, taking findings, it was very subtle, they are very minimal, and you

cannot expect—or at least we do not expect ourselves to have a thousand per cent or a hundred per cent batting average on detecting things like that.
* * * * *
"THE COURT: You think that if you read these x-rays routinely you may or may not have picked this up?
"THE WITNESS: There are some subtle things in an x-ray we won't get every time.
"THE COURT: And this was subtle?
"THE WITNESS: Very." (Tr. pp. 127–129.)

grounds it violates **Rule 18**—which it surely does.

Thirteen specifications of error are listed, but are reduced by appellant to these three:

(1) Did the court err in granting a non-suit as to Dr. Donley?

(2) Was there substantial evidence to support the jury verdict, or were erroneous instructions given the jury?

(3) Did the trial judge err in his "comments" during the case; in his remarks made to witnesses; in his questioning of witnesses; in his sustaining certain objections to questions asked by appellant's counsel below?

## I—THE DISMISSAL OF DR. DONLEY

The dismissal of Dr. Donley was proper. There was no expert testimony that he had acted negligently or "improperly," or in any way not in conformity with the medical practice of experts in his specialty in Oregon.

Appellant urges that "Dr. Donley was negligent *in failing to properly treat* the appellant by failing to take adequate and proper x-rays." Dr. Donley was never employed to treat appellant, or to determine what x-rays were to be taken, or even to take them. His sole obligation was to read and report on x-rays taken by others. There was no substantial evidence that he failed to do this. The preponderance of medical testimony, even that produced by appellant below, substantiated the fact he had acted completely in accordance with his obligation.

Kingston v. McGrath, 9 Cir., 232 F.2d 495, 54 A.L.R.2d 267 (relied on heavily by appellant), reversed a judgment of dismissal entered below in favor of the attending physician—there Dr. McGrath, here Dr. Thomas. The trial court thus did here (in letting the case go to the jury as to Dr. Thomas) exactly what this court said the trial court should have done in McGrath, let that case go to the jury. Kingston v. McGrath is of no aid to appellant herein.

In urging that the x-rays "were taken by a technician working under Dr. Donley, so we would apply the unquestionable legal principle of respondeat superior," (p. 32 of Brief) appellant cites evidence which establishes the technician Dr. O'Daugherty, was employed by the hospital; the orders for the x-rays desired were given by Dr. Thomas to Dr. O'Daugherty; Dr. O'Daugherty did the technical work—and Dr. Donley merely interpreted the x-rays. There is not the slightest possibility of finding "respondeat superior" on the record before us. No master and servant relationship existed between Dr. Thomas and Dr. Donley.

When, after two experts had testified for appellant, the court asked Mr. Ryan, counsel for appellant below, if he was "still holding Mr. Morrison" (counsel for Dr. Donley), Mr. Ryan replied: "I will wait until my doctor testifies. I have another doctor * * *. I think he will testify there was malpractice here."

Dr. Stern then did testify. His testimony is outlined above, and he specifically found no negligence on the part of the radiologist. (Tr. p. 211.) The court repeated this testimony—the statement of "no negligence." Mr. Ryan did not dispute it, nor could he. When the court said: "I think no one has tied in Dr. Donley," Mr. Ryan stated: "I think that is correct." The motion to dismiss was made on Dr. Donley's behalf, and no objection was interposed. Appellant's counsel has thus waived his client's right to object on appeal. Rule 41, Fed.R.Civ. P. Bucy v. Nevada Construction Co., 9 Cir. 1942, 125 F.2d 213; Fowler v. Crown-Zellerbach Corp., 9 Cir. 1947, 163 F.2d 773. Many other cases are available to the same effect.

Rule 46 makes exceptions unnecessary, but requires in so many words that a party "makes known to the court his objection to the action of the court and his grounds therefor." This appellant utterly failed to do below.

## II—WAS THE JURY'S VERDICT SUPPORTED BY SUBSTANTIAL EVIDENCE?

■■ On this point, beyond a lengthy statement of the point (3 in Appellant's Brief) [6] appellant cites two cases to establish the legal principle that "the verdict of the jury must be shown to rest on substantial evidence, and not on mere speculation or conjecture." We agree. A careful perusal of the evidence indicated it did so rest.

## III—THE TRIAL JUDGE'S COMMENTS AND QUESTIONS INVADED THE PROVINCE OF THE JURY

■■ Here it is difficult for appellant to get down to any one specific error—she urges the judge's general attitude was such that the jury was undoubtedly "mesmerized"—that the expressions, questions and actions of the court indicated an antipathy toward appellant and her cause of action, which resulted in a miscarriage of justice.

We cannot agree with such a general indictment of the judge's judicial demeanor. He did rule his courtroom as the chief actor therein—he should have done so.

Yet he made several rulings unusually favorable to appellant. He declined to follow, for example, the Oregon rule urged by defendants that an expert medical witness, to qualify, must show he is familiar with the practice in a particular community. Beadle v. Paine, 46 Or. 424, 80 P. 903. (Tr. p. 215). He allowed, over defendants' objection, one of plaintiff's expert witness (Dr. Mickel) to contradict the expert testimony of plaintiff's own treating doctor, Dr. Alban, who had discovered the fracture. Dr. Alban testified that the original accident caused *both* the dislocation and the fracture—Dr. Mickel disputed this.

Despite our conclusion that the trial judge ruled properly and fairly, and in some cases very favorably to appellant, there is a more fundamental aspect to this claimed error. *Appellant's trial counsel made no objection whatsoever at the trial to any of the court's actions or rulings;* [7] made no motion for a directed verdict, nor for a judgment *non obstante veredicto.*

Rules 46 and 51 of the Federal Rules of Civil Procedure here prevail. They are no mere technicalities. Johnston v. Reily, 82 U.S.App.D.C. 6, 160 F.2d 249, 250. They have a genuine purpose, Crespo v. Fireman's Fund, 318 F.2d 174 (9 Cir. 1963), essential to the orderly administration of justice. Southern Pac. Co. v. Villarruel, 9 Cir. 1962, 307 F.2d 414, 415. Appellant urges the "clear error" rule, but this court has refused to apply that rule in civil cases where there has been a failure to comply with the requirements of Rule 51. (See Crespo v. Fireman's Fund, supra, and cases cited in note 3 thereof.)

While one judge may be more ascerbic than another in cautioning witnesses who tend to go beyond the question asked them, of necessity a large latitude is left within the judgment and judicial discretion of any trial judge. We find no abuse of that discretion here, and no "plain error."

6. "3. THE VERDICT OF THE JURY WAS CONTRARY TO LAW AND CONTRARY TO THE EVIDENCE: THERE WAS NO SUBSTANTIAL OR PREPONDERANT EVIDENCE TO SUPPORT THE VERDICT OF THE JURY: THE VERDICT OF THE JURY WAS CAUSED BY THE ERROR OF THE TRIAL COURT IN ITS INSTRUCTIONS WITH RESPECT TO PLAINTIFF, WITH RESPECT TO RIGHT OF RECOVERY FOR AGGRAVATION OF INJURY CAUSED BY A PREVIOUS ACCIDENT, WITH RESPECT TO NEGLIGENCE, WITH RESPECT TO THE REQUIREMENTS NECESSARY IN ESTABLISHING MALPRACTICE, AND WITH RESPECT TO THE ELEMENTS OF DAMAGE."

7. There was one feeble objection to one instruction (Tr. p. 298). Appellees refer to it as "unintelligible." It was, at best, never completely or properly phrased.

Appellant had a jury pass upon her claim. We recognize that malpractice actions recoveries' are not easy to establish. But appellant labored with a difficulty in factual proof: How much of her fractured and dislocated neck was the proximate result of her original accident, and how much, if any, the result of a failure on the part of Dr. Thomas to discover either the fracture or the dislocation? Admittedly he found neither, but that alone did not establish his negligence, or that he was guilty of malpractice. The expert testimony of appellant, at best, was weak on this critical issue—critical legally and critical psychologically. While appellant did make out a case for submission to a jury on the issue of negligence, the evidence did not require a verdict in appellant's favor—she did not ask for it, or for judgment *non obstante veredicto,* or for a new trial. The jury found in Dr. Thomas' favor. There is no basis for this court to overturn that verdict.

The judgment of dismissal and the judgment based on the jury's verdict, are severally affirmed.