406 F.2d 1205
 EL RANCO, INC., a Nevada corporation, El Ranco Hotel Operating Company, a Nevada corporation, Beldon R. Katleman, MCA Artists, Ltd., a Delaware corporation, Roy Gerber, and Matt Gregory, Appellants,
v.
The FIRST NATIONAL BANK OF NEVADA, as Administrator of the Estate of Rene Bardy, Deceased, Appellee.
 No. 20241.
 United States Court of Appeals Ninth Circuit.
 October 30, 1968.
 Rehearing Denied April 3, 1969.
 
 COPYRIGHT MATERIAL OMITTED Samuel S. Lionel (argued), Foley Brothers, Matt Gregory in pro per, Las Vegas, Nev., Leo K. Gold, Rosenfeld, Meyer & Susman, Victor Netterville (argued), Beverly Hills, Cal., for appellants.
 Morton Galane, Las Vegas, Nev. (argued), Robert List, Carson City, Nev., Joseph Alioto, San Francisco, Cal., for appellee.
 Before HAMLIN, KOELSCH and BROWNING, Circuit Judges.
 KOELSCH, Circuit Judge:
 
 
 1
 The late Wm. C. Mathes, that eminently perceptive and widely experienced trial judge, characterized this dispute "not only a kettle of fish, but scrambled eggs thrown in on top. * * *" He no doubt mixed the metaphor deliberately.
 
 
 2
 The plaintiff, Rene Bardy, a citizen of France was (according to his evidence) a veritable Florenz Ziegfeld of the European entertainment industry.[1] For years he produced lavish "French type" revues not only in the Montmartre District of Paris but in many cities throughout western Europe. These revues, often advertised through the press and other news media as "La Nouvelle Eve," after the night club in Paris where they originated, followed a uniform pattern — a series of tableaux featuring a liberal number of scantily clad mannequins interspersed with acts performed by similarly attired (or unattired) singers and dancers. It was perhaps inevitable that Bardy would eventually come to the attention of the proprietors of Nevada's gambling casinos, whose relentless quest for patronage has led them to spend immoderate sums for attractions baroque and sensational. So it was that late in 1958 MCA, Bardy's booking agent, secured for him an engagement at an establishment known as El Rancho Vegas.[2] The contract, dated December 1, 1958, and entered into with El Ranco Hotel Operating Co., called for a show with a cast of 32 people to be presented during the ten week period commencing January 28, 1959, and ending April 7. The agreed price was $15,000 a week.
 
 
 3
 In March, a further contract was entered into extending the run to June 2, on terms essentially the same as those in in the original contract, except El Ranco agreed to pay Bardy $5,000 net each week and itself assume all expenses arising in connection with the show.
 
 
 4
 The latter contract, however, never went into effect. On April 8, the first day of the extended term, Beldon Katleman, the manager-sole shareholder of El Ranco, declared a rescission on the ground that Bardy had committed a material breach. A week later the show did resume in a modified version and continued to play until June 2, when it ended. Subsequently, on July 29, the chorus girls of the La Nouvelle Eve show returned to the El Ranco Hotel where, in a production advertised as "La Nue Eve", they appeared until October 21.
 
 
 5
 Bardy's suit was in two parts. The first concerned a claim (hereinafter the "contract claim") against El Ranco Hotel Operating Co. for the unpaid balance allegedly due and owing on the December 1 contract. The second part, relating to the period from April 8 through October 21, concerned primarily an asserted civil conspiracy. Bardy's contention, as reflected in his complaint and the pretrial order was in substance that Katleman, Roy Gerber (MCA's Las Vegas representative), Matt Gregory and Fred Haettel had conspired and confederated together for the purpose of harming his property and contract rights with respect to the La Nouvelle Eve show and, pursuant to that conspiracy, had committed a number of wrongful acts; in addition to the actual conspirators he included as parties defendant under appropriate allegations and statements El Ranco Hotel Operating Co., its successor El Ranco, Inc., MCA and Turrett Corporation.
 
 
 6
 In the alternative Bardy, apparently believing this to be necessary to permit some recovery in the event the proof of an over-all conspiracy should fail, charged various of the allegedly conspiratorially inspired acts against those defendants whom he asserted were directly responsible.
 
 
 7
 At the conclusion of a protracted trial, the jury rendered verdicts as follows: On the "contract claim", for Bardy and against El Ranco Hotel Operating Co. in the amount of $27,281.00 (later reduced on Bardy's remittitur to $24,300.00); on the "conspiracy claim", for Bardy and against all defendants save Turrett Corporation and Haettel. Damages were assessed in the sum of $476,000, consisting of $251,200 compensatory and $225,000 punitive damages.[3] All Defendants, save Turrett and Haettel, have appealed.
 
 
 Matters in Abatement
 
 
 8
 A. El Ranco argues that Bardy was not the real party in interest, entitled to commence and prosecute the contract claim because, as appears on the face of the contract itself, the agreement was one between El Ranco Hotel Operating Co. and La Nouvelle Eve Corporation and not El Ranco and Bardy.
 
 
 9
 El Ranco's reliance upon the familiar parol evidence rule is misplaced. Subject to many exceptions, that rule operates merely to forbid evidence to vary the terms of a writing, not to prohibit proof as to who the parties to a contract in fact are. Annot., 80 A.L.R.2d 1137, 1144-1145 (1961). Here, there was substantial proof that no entity as La Nouvelle Eve Corporation had ever existed, that Bardy intended to and did sign the contract in his individual capacity and that El Ranco dealt with him accordingly.
 
 
 10
 B. Under the heading "The admission into evidence of assignments to appellee executed after commencement of the action was prejudicial error" appellants make what in substance is a contention that Bardy was not the real party in interest.
 
 
 11
 By Nevada law (NRCP 17(a)) an action must be commenced by the real party in interest; otherwise the complaint will be dismissed. Las Vegas Network, Inc. v. B. Shawcross, and Associates, 80 Nev. 405, 395 P.2d 520 (1964). And where the issue is whether a plaintiff is the real party in interest, an assignment of a claim to him after he has commenced an action thereon does not relate back to the time suit was commenced. Thelin v. Intermountain Lumber, etc., 80 Nev. 285, 392 P.2d 626 (1964).
 
 
 12
 Bardy commenced this suit as an individual asserting that he was the owner not only of the contract and conspiracy claims but also the property and property rights out of which the claims arose. Defendants challenged these assertions and affirmatively alleged that several other named persons and French "societes" (corporations) were. At the trial after Bardy had made out a prima facie case consistent with his allegations and defendants had countered with proof to the contrary, he then introduced in rebuttal written assignments to him from all the named persons and societes of any and all rights they had in both property and claims. Defendants objected to the admission of these instruments on the ground, among others, that they post-dated the commencement of the action.[4] Appellants contend that the District Court erred because "under Nevada law an assignee has no claim unless the assignment was executed prior to commencement of this action" and urge that the error was prejudicial because the jury may have relied on the assignments in assessing damages.
 
 
 13
 However, unlike the plaintiffs in Thelin and Shawcross Bardy did possess an interest at the critical date aside from any thereafter acquired by assignment. The jury settled any question on that score for in rendering a verdict for Bardy on the contract claim it necessarily found that Bardy could agree to present the La Nouvelle Eve show, using its name, etc., and receive the moneys for so doing. The contract, of course, antedates the filing of the complaint. Nor could appellants have been prejudiced by the admission of these assignments; no proof whatever was offered or admitted of any injuries suffered by the appellants with respect to the subject matter of the assignments during the period following the filing of the complaint.
 
 
 14
 C. On the premise that Bardy used "La Nouvelle Eve" as a trade name in his Nevada dealings, appellants argue that he should not have been permitted access to the court because of his failure to comply with the Nevada assumed business name statutes which require "[e]very person * * * conducting, carrying on or transacting business" in that State "under an assumed or fictitious name" to file for public record a certificate disclosing his true name and which make such filing a pre-condition to the commencement of action on "any contract made or transaction had" or "on account of any cause of action arising or growing out of the business so carried on under such name or designation * * *" (Nevada Rev.Stat. 602.010, 602.020 and 602.070). The trial judge ruled as a matter of law that Bardy's activities did not constitute the "conducting" etc. of business within the purview of the statute.
 
 
 15
 The Nevada Supreme Court, in the only local case construing these statutes, has taken the position generally held by courts of other states having similar legislation [See for example Bacon v. Gardner, 38 Wash.2d 299, 229 P.2d 523 (1951)] that the phrase "conducting, etc. of business" does not include an occasional or isolated business transaction but rather connotes continual commercial activity. Paterson v. Condos, 55 Nev. 134, 144, 28 P.2d 499 (1934).[5]
 
 
 16
 In the instant case it was not disputed that Bardy entered Nevada for the sole purpose of presenting his revue at the El Rancho Hotel and with the definite intention to leave at the end of the engagement, that his business dealings were limited to matters incidental to such presentation, and that his actual stay was not of long duration. On these facts we cannot say that the statute would apply. See Richmond Screw Anchor Co. v. E. W. Minter Co., 156 Tenn. 19, 300 S.W. 574 (1927).
 
 
 17
 D. El Ranco further urges that even if the title was a mere trade name, Bardy nevertheless may not sue as an individual. It argues that, having "[held] himself out as doing business as a corporation he is estopped to deny that such a corporation exists".[6]
 
 
 18
 The doctrine invoked by El Ranco rests upon equitable principles; it operates to protect persons who would otherwise suffer loss or incur liability because of their reliance in good faith upon a false representation made by a person in charge of a business regarding the legal nature of the business entity organization with which the dealings are carried on. Casey v. Galli, 94 U.S. 673, 24 L.Ed. 168, 307 (1876); Union Mutual Life Ins. Co. v. Mowry, 96 U.S. 544, 24 L.Ed. 674 (1877), 19 Am.Jur. Estoppel § 39. Prejudice is an essential element of an estoppel. United States v. Dunn, 268 U.S. 121, 45 S.Ct. 451, 69 L.Ed. 876 (1925); Hammond v. Tate, 83 F.2d 69, 105 A.L.R. 433 (10th Cir. 1936); Jones v. United States, 96 U.S. 24, 24 L.Ed. 644 (1877); Deitrick v. Greaney, 309 U.S. 190, 60 S.Ct. 480, 84 L.Ed. 694 (1940), reh. denied, 309 U.S. 697, 60 S.Ct. 611, 84 L.Ed. 1036 (1940); 19 Am.Jur. Estoppel § 85 (1939).
 
 
 19
 Under the evidence in this case it is at least doubtful that Bardy "held himself out as doing business as a corporation." But granting that he did, there is no proof whatever that El Ranco was in any way injured or misled as a result of any such misrepresentation. As was well said long ago by the Michigan Supreme Court, "If there was no corporation in fact, and if there are no facts which make it unjust to forbid its denial, it is difficult to understand what room there is for an estoppel * * *" Doyle v. Mizner, 42 Mich. 332, 3 N.W. 968, 970 (1879).[7]
 
 
 20
 E. El Ranco further urges that the district judge should have dismissed the action because Bardy failed to submit the claim to arbitration. The court's ruling denying the motion was rested (correctly, we hold) on the ground that those parties had not entered into any arbitration agreement. The contract between Bardy and El Ranco did not in terms provide for arbitration. What it contained was a provision which purported to require Bardy to be a member of AGVA and to abide by "AGVA's Rules and Regulations, Constitution and By-Laws * * *" As appears from another exhibit, one of such by-laws required members of AGVA "To refer all grievances for arbitration in accordance with the rules of AGVA. * * *"[8] AGVA was a labor organization and a collective bargaining representative for actors and other theatrical performers. The provisions for arbitration in the by-laws was consistent with its duties as such representative and (as appears from the form collective bargaining agreement that Bardy and AGVA signed) had a counterpart in collective bargaining agreements which AGVA entered into with employers. In short the two provisions in the respective agreements taken together provided a convenient and speedy means for union and employer to settle disputes between an employee and employer arising out of the latter's employment. Obviously, Bardy was not El Ranco's employee and neither was he a member of or eligible for membership in AGVA. Further still, there was no proof that El Ranco had signed a collective bargaining agreement with AGVA and hence committed itself to arbitration "in accordance with the rules of AGVA."[9] The "Contract Claim"
 
 
 21
 El Ranco urges that the evidence is insufficient to sustain the verdict because there is no proof of Bardy's performance of the contract and additionally that the evidence establishes as a matter of law "that nothing was owed." Neither contention has merit. Bardy testified generally that he had done everything required of him under the contract. Such evidence was admissible and sufficient to make out a prima facie case and thus tender a factual issue for the jury to resolve.
 
 
 22
 While it is true that El Ranco introduced considerable evidence tending to show payment in full, the jury was not bound to accept it as establishing that fact; moreover, El Ranco's proof that "nothing was owed" included several claimed offsets which Bardy disputed.[10]
 
 
 23
 There being no error, the judgment on the contract claim is affirmed.
 
 
 24
 
 The "Conspiracy Claim"
 
 
 
 25
 1. Appellants urge that the evidence was insufficient to prove a conspiracy. Bardy adduced no direct proof of a conspiratorial agreement but the record contains substantial circumstantial evidence to support the factual conclusion that Beldon Katleman, Roy Gerber and Matt Gregory had indeed formed a conspiracy. Briefly summarized the evidence favorable to Bardy as the prevailing party was to this effect.
 
 
 26
 La Nouvelle Eve opened as scheduled on January 28, and was at once so well received that Katleman wanted to secure an extended engagement for an additional eight weeks. Since he had previously engaged a comedian, Joe E. Lewis for that same period, he proposed that Bardy stage an abbreviated version of the revue and cut his price. Bardy disdained any such suggestion and flatly refused, taking the position that a diminished troupe would hurt the prestige of the show. Instead he submitted on a "take it or leave it basis" a written counteroffer to continue the same complete show for a flat fee of $5,000 net to himself with El Ranco paying all running expenses. Katleman was incensed by this cavalier treatment; although grudgingly acceding to Bardy's unpalatable terms, he swore to "get even" and "teach Bardy a lesson".
 
 
 27
 Matt Gregory was an actors' agent and as such represented Janine Caire who with Aleta Morrison were among the prominent performers in the La Nouvelle Eve show. Neither had employment agreements with Bardy for the extended run, a fact of which Katleman was well aware. Katleman seized upon the possibility that Morrison and Caire might leave the show as a means of rescinding the extension contract with Bardy. On April 1, 1959, he wrote to AGVA stating that he anticipated a breach of contract and requesting their support in closing the show at the conclusion of the initial run.
 
 
 28
 On the same day, Roy Gerber (MCA's Las Vegas representative) sent copies of Katleman's correspondence with AGVA to MCA's house counsel in New York accompanied by his own letter saying that the troupe "was very unhappy and several are leaving or are threatening to leave" and concluding with the suggestion "Frankly, I guess the only thing we can do, in view of these developments and the attitude of the cast is to go along with Beldon and close the whole thing out * * *."
 
 
 29
 Meanwhile Bardy, "receiving rumors" of difficulties, cabled Gerber on April 2 and April 6 asking for a response. In spite of these cables Gerber did not contact Bardy or MCA's Paris office. Nor did he say anything about the forthcoming cancellation to Regis Durieux or Roy Holmes (who were in charge of the show).
 
 
 30
 On April 8, the show was to have opened under the extension contract. But this was not to be. As anticipated by Katleman, Morrison and Caire were not present for the performance. Without notifying Durieux or Holmes, Gregory had abruptly escorted both performers to Beverly Hills.[11] This trip was, no doubt, facilitated by the $500 check issued Gregory by El Rancho Hotel on the previous day. With these two performers absent, Katleman refused to allow the show to go on and thereupon rescinded the extension contract with Bardy on the ground that Caire and Morrison were indispensable. Durieux and Holmes protested, insisting that replacements were available for the two missing performers. Rather than defend Bardy's interest Gerber sided with Katleman. He said that Durieux and Holmes were "being very stupid", that Bardy was clearly in breach and that Katleman was justified in cancelling the contract.
 
 
 31
 Bardy had returned to Paris about a month earlier, and could not be reached. For the next several days Durieux and Holmes, plagued by the stranded troupe, lacking authority and, perhaps equally important, money to defray expenses, were literally at wits end. On April 9, Katleman, through Gerber and an AGVA official, gave them an ultimatum: La Nouvelle Eve, using such artists as Katleman might engage, could resume; he would pay Bardy $2,000 a week and meet the payroll himself. Once again Bardy's employees received no support from their agent Gerber. To the contrary, Gerber urged the hapless Durieux and Holmes to accept Katleman's terms, saying that this move was the "only solution." After some hesitancy Durieux reluctantly agreed, although Holmes refused to join or accept any responsibility. At about the same time Caire, under the management of Gregory, entered into a contract with El Ranco and performed in the abbreviated version of the La Nouvelle Eve Show which played from April 15 to June 2.
 
 
 32
 Prior to bringing the show to Las Vegas Bardy had entered into a contract with one Charley Henchis to put on the ballet numbers in the La Nouvelle Eve Show and following that engagement to take his troupe to Bardy's night club in Paris. However, the latter part of this contract was not kept.
 
 
 33
 Henchis had hardly arrived in Paris before Gregory persuaded him to return to Las Vegas. The written contract that he signed was ostensibly with Gregory but the latter admitted under cross-examination that he had acted for Katleman in the matter. From July 29 through October 21 the dancers billed as "Les Girls de Paree" appeared, in combination with the comedian Lewis, under the title "La Nue Eve." Gerber also figured in this sequence of events, securing for Katleman a choreographer to assist in restaging one of the ballet numbers in the La Nue Eve show.
 
 
 34
 From these facts the conclusion is virtually irresistible that the events which followed the execution of the extension contract were neither casual, unplanned nor due to mere happenstance, but rather were controlled by Katleman and comprised an integral part of a Machiavellian scheme not only to violate Bardy's legal rights and avenge a real or fancied insult but in addition to profit the schemer financially.
 
 
 35
 These facts likewise point to the conclusion that Gregory was consciously cooperating with Katleman to consummate some scheme to injure Bardy. The fact that he was paid $500, at or about the time he escorted Caire and Morrison from Las Vegas, that he returned Caire shortly afterward, making her available again for the La Nouvelle Eve Show and that he engaged the Charley Ballet for the La Nue Eve Show all tend to show action pursuant to an agreement with Katleman; and the nature of the acts, their timing, manner in which they were performed and the consequences which would naturally follow likewise suggest that Gregory was aware of the nature of Katleman's scheme.
 
 
 36
 As for Roy Gerber, Bardy conceded that he had "faithfully performed his duties up until March 30, 1959". But the evidence of his conduct thereafter reflects such a drastic change in the quality of his performance as to suggest a deliberate purpose to join with Katleman in carrying out the scheme to harm Bardy. He failed to warn Bardy of Katleman's plans, failed to reply to cablegrams from Bardy, backed Katleman's claim that Bardy had breached the extension contract, helped Katleman obtain the modified La Nouvelle Eve show with its lower fee for Bardy, and assisted the preparation of the La Nue Eve show. These actions taken together indicate a disregard for Bardy's interests, a knowledge of Katleman's plans to injure Bardy and willful assistance in carrying out those plans.[12]
 
 
 37
 2. The case went to the jury under instructions, not objected to by Bardy, that liability might be imposed against the corporate defendants only on a finding of their subsequent ratification of the wrongful conduct of their agents. Thus the judgment against MCA and El Ranco can stand only if there is evidence to show that Gerber and Katleman were purportedly acting for the respective companies, that the latter knew the material facts surrounding the unauthorized transactions, and that with such knowledge they approved what their agents had done.
 
 
 As to MCA
 
 
 38
 Since Gerber was the local representative of MCA and his actions concerned a client, there can be little doubt that the first of the above requirements is met. But this is not true with respect to the second.[13] MCA's only sources of knowledge of Gerber's acts were Gerber's reports and Bardy's complaints to the Paris office. Bardy, of course, complained that Gerber had failed to communicate with him. The same was true for MCA. In a letter to Gerber dated April 17, 1959, David Stein (MCA's Paris agent) wrote: "To the present moment, I have never still [sic] heard from you. I don't know if the show continued on, or not, and what happened to Bardy's position, and we are supposed to be his representatives." Gerber's earlier reports to MCA, coupled with his failure to correspond during the crucial period, indicated his incompetence and failure to adequately protect Bardy's interests and appropriately enough, elicited a strong censure from MCA.[14] But the evidence fails to show MCA's knowledge of facts which could lead it to conclude that Gerber had confederated with Katleman to harm Bardy. In particular no evidence was presented to show that MCA knew of Gerber's assistance to Katleman in closing the show on April 8 and in obtaining the modified contract for the extension of the La Nouvelle Eve show.
 
 
 39
 The appellee, seemingly aware of the absence of evidence showing knowledge of MCA of Gerber's acts, seeks to rely on the "evidentiary rule of the missing witness." The appellee argues that: "Viewed against the failure of Stein [MCA's Paris agent] to testify, this evidence clearly permitted the jury to infer that MCA had knowledge of the existence of the conspiracy and Gerber's membership therein." This reliance upon an inference drawn from Stein's failure to testify is misplaced. "The unfavorable inference arising from the failure of a party to call available witnesses does not amount to substantive proof and cannot take the place of proof of a fact necessary to the other party's case; it does not relieve the other party from the burden of proving his case." 29 Am.Jur.2nd Evidence § 187 (1967). The burden was upon the appellee to prove that MCA had knowledge of Gerber's participation in a conspiracy. This burden was not met.
 
 
 As to El Ranco
 
 
 40
 Katleman was the sole shareholder and manager of El Ranco Hotel Operating Company and its successor corporation El Ranco, Inc. He was also the ringleader in the conspiracy. Obviously the corporations knew what he knew and approved of his acts.[15]
 
 
 41
 3. The district court instructed the jury that if it found that two or more of the individual defendants entered into an agreement to violate the lawful rights of the plaintiff and that overt acts were knowingly done by one of the conspirators in furtherance of some purpose of the conspiracy, that each conspirator would be liable for any loss or damage proximately caused by those overt acts.
 
 
 42
 The appellants now object to those instructions. They argue that "the court should have reversed the order of its instructions * * * so as to require the jury to make express findings on each of the alleged tortious acts and contract breaches." However, no objection was made to these instructions below as required by Rule 51 and the point is thus not available to them for the first time on appeal. Bock v. United States, 375 F.2d 479 (9th Cir. 1967); Rudick v. Prineville Memorial Hospital, 319 F.2d 764, 770 (9th Cir. 1963).[16]
 
 
 43
 In a related argument the appellants assert that, even under the instructions as given, "the jury must have been able to find by clear and unequivocal evidence that the defendants MCA and Gerber knowingly agreed with the other defendants, or at least one of them, to do the [alleged overt acts]." In so arguing the appellants misconstrue the trial judge's instructions. The trial judge clearly instructed that all co-conspirators are liable for acts done during the continuance of the conspiracy and in furtherance of some purpose of the conspiracy even though the acts may have occurred without the knowledge of one of the defendants. The jury need not have found that each defendant had knowledge of each act. Rather the jury verdict must be sustained if the jury could reasonably have found that the defendants were members of a conspiracy and that the alleged overt acts were carried out in furtherance of some purpose of that conspiracy. As we have stated above, the evidence supports this conclusion.
 
 
 44
 4. Appellants next maintain that the court erred in refusing to instruct the jury that the proof necessary to establish a civil conspiracy must be "clear and convincing" and in giving an instruction that "a clear preponderance of evidence" was required. Neither Nevada statutes nor court decision provide any standard. Courts in some states have announced "a preponderance of evidence rule" [See, e. g., Acadian Production Corp. of Louisiana v. McKendrick, 223 La. 79, 64 So.2d 850 (1953)] while those in others require the proof to be "clear and convincing." Thus in the absence of controlling Neveda statute or judicial precedent, we cannot fault the trial judge, for the test he announced at least comports with the lesser requirement.
 
 
 45
 Moreover, we share the view of the trial judge and at least two state courts that despite the difference in wording between an instruction such as the one given and the one requested, the quality of proof required by either is essentially the same. See First Nat'l Bank of Morrill v. Ford, 30 Wyo. 110, 216 P. 691, 698, 31 A.L.R. 1441 (1923); Winston v. Burnell, 44 Kan. 367, 24 P. 477, 478 (1890); compare United Mine Workers of America v. Gibbs, 383 U.S. 715, 737, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).
 
 
 46
 5. Appellants next urge that the judgment be set aside because the damages awarded are contrary to law, grossly excessive, and not supported by the evidence.
 
 
 47
 Under the trial court's instructions, if the jury found for the plaintiff on the conspiracy claim, it was to determine damages resulting from certain acts alleged to have been committed pursuant to the conspiracy. In brief, the jury was to determine the extent of damages, if any, caused by: (1) the use of plaintiff's property from April 8, 1959 to June 2, 1959 (the period during which the La Nouvelle Eve show played in modified form), (2) the confusion as to the source of production of the show from July 29, 1959 to October 21, 1959 (the period during which the La Nue Eve played), (3) injury to the trade name La Nouvelle Eve caused by the presentation of the show La Nue Eve, (4) deprivation to Bardy of the use of the performers in a show in his Paris night club from July 29, 1959 to October 21, 1959 and (5) damages resulting from MCA's breach of its agency contract.
 
 
 48
 The appellants argue that the award of damages was improper because the trade name La Nouvelle Eve is not protected under the Lanham Act.[17] They assert that the plaintiff made an election to rely on the Lanham Act for one of the items of damages under the conspiracy claim and that therefore the major item of damages fails as a matter of law. This contention is not correct. The plaintiff's election to rely on the Lanham Act applied only to the alternative claim for trade-name infringement against El Ranco and Katleman individually. The instructions for damages under the conspiracy claim were based on the common law of Nevada. Since the jury found for the plaintiff on the conspiracy claim, it did not reach the claim under the Lanham Act. Thus error, if any, in the instructions pertaining to the Lanham Act is now irrelevant.
 
 
 49
 The appellants further assign as error the District Court's admission into evidence of records, contracts, and testimony showing the financial arrangements made by the Tropicana Hotel for the "Folies Bergere" show and by the Stardust Hotel for the "Lido" show. The purpose of this evidence was to show Bardy's loss of future profits. The appellants assert that the evidence was incompetent because a proper foundation had not been laid "to show the precise similarity between plaintiff's property and properties offered for comparison." This objection misstates the test for admissibility: "[O]nce a foundation of reasonable comparability was shown, evidence of sales * * * and profit margins * * * were admissible at the sound discretion of the trial court. The effect of differences in circumstances, rather than absolutely conditioning admissibility, is a question more properly addressed to the jury under appropriate instructions." Standard Oil Co. v. Perkins, 347 F.2d 379, 387 (9th Cir. 1965). The shows in question were all Paris-type revues. They were publicized as being in a similar class. An expert witness testified that he considered the artistic quality of the La Nouvelle Eve shows second to that of the Lido shows. With this foundation we cannot say that the trial court abused its discretion by admitting the evidence.
 
 
 50
 Several of the appellants' assignments of error amount to a contention that there was no substantial evidence to justify the award of compensatory damages under the conspiracy claim. As a general proposition they assert that the award of $251,200 general damages violates the rule against remote and speculative damages. In particular they assert that the evidence does not justify the implied findings that the names La Nouvelle Eve and La Nue Eve were substantially similar, that the trade name La Nouvelle Eve had a secondary meaning, that the trade name La Nouvelle Eve was actually damaged, that Bardy was deprived of the services of his performers in Paris, that Bardy was damaged as the result of such deprivation, that MCA breached its agency contract and that the plaintiff was injured as the result of such breach.
 
 
 51
 The exact monetary loss sustained by Bardy cannot be calculated. But the record does establish that he was in fact injured and we conclude that sufficient evidence was presented to allow the jury to set general damages at $251,200.
 
 
 52
 "Where the tort itself is of such a nature as to preclude the ascertainment of the amount of damages with certainty, it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts. In such case, while the damages may not be determined by mere speculation or guess, it will be enough if the evidence shows the extent of the damages as a matter of just and reasonable inference, although the result be only approximate. The wrongdoer is not entitled to complain that they cannot be measured with the exactness and precision that would be possible if the case, which he alone is responsible for making, were otherwise. [citations omitted] As the Supreme Court of Michigan has forcefully declared, the risk of the uncertainty should be thrown upon the wrongdoer instead of upon the injured party." Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 563, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931).
 
 
 53
 From the evidence presented at the trial the jury could reasonably have concluded that the names La Nouvelle Eve and La Nue Eve were confusingly similar; that the name La Nue Eve was intentionally chosen to capitalize upon the reputation of the La Nouvelle Eve show; that the quality of the La Nouvelle Eve show was good; that the La Nouvelle Eve show could have been booked in Las Vegas on a continuous basis with longer and better engagements; that Bardy could have received at least $5,000 in profits each week the show played;[18] that the La Nue Eve show had a poor reputation; and that sales resistance to the La Nouvelle Eve show developed as a result of the production of La Nue Eve. On the basis of these conclusions the jury could properly determine that the plaintiff lost $251,200 in profits after April 8, 1959 as a result of the presentation of the modified La Nouvelle Eve and the La Nue Eve shows.
 
 
 54
 Since the record supports the award of damages based upon the use of the plaintiff's property and infringement of the trade name La Nouvelle Eve, we need not look further to determine whether the evidence also shows that Bardy was injured as a result of the deprivation of the performers in Paris from July 29, 1957 to October 21, 1959 or whether any additional damages followed from MCA's breach of its agency contract.
 
 
 55
 Appellants MCA and Gerber also attack the award of punitive damages on the grounds that it is unsupported by the evidence and excessive in amount. Since, as we have earlier concluded, MCA did not ratify Gerber's acts, it is not liable for either compensatory or punitive damages. But the evidence supports the jury's award of punitive damages against Gerber.
 
 
 56
 Gerber argues that there was no evidence that he acted with the necessary malice to support an award of punitive damages. But, as the trial judge instructed, malice "does not necessarily mean personal spite or ill will toward the plaintiff. A person may be found to act wantonly or maliciously or oppressively if he intentionally acts in willful violation and disregard of the rights of another, for the purpose either of causing loss or damage to such person, or of bringing about profit or gain to himself." Based on the evidence presented, the jury could have concluded that Gerber was seeking to benefit himself and MCA by currying Katleman's favor in disregard of Bardy's rights and interests.
 
 
 57
 Gerber further argues that the award of $225,000 in punitive damages was manifestly excessive since "one may be punished without being destroyed." Miller v. Schnitzer, 78 Nev. 301, 311, 371 P.2d 824, 829 (1962). However, Gerber introduced no evidence showing his ability to pay. Consequently we are in no position to determine what amount of punitive damages will punish him without at the same time destroying him.
 
 
 58
 6. Of appellant's remaining points — all of which we have thoughtfully considered — only the two discussed herewith are of sufficient merit to warrant space in this opinion.
 
 
 59
 The first relates to the place of trial, appellants' position being that the matter ought to have been heard at Las Vegas rather than Carson City, Nevada. The action was filed in Las Vegas but the trial judge set Carson City as the place of trial. The court manifestly had the power to make the order that it did designating the latter place. Title 28 U.S.C. § 108 provides: "Nevada constitutes one judicial district. Court shall be held at Carson City, Elko, Las Vegas and Reno." This provision merely specifies the places where court shall be held. It does not, as appellants argue, divide the district into divisions. See United States v. Harman, 349 F.2d 316, 319 (4th Cir. 1965). Since no statute or rule exists separating the district into divisions the court simply did what 28 U.S.C. § 1404(c) recognizes that a court can do, that is "order any civil actions to be tried at any place within the division in which it is pending." Nonetheless the appellants argue that the trial judge did not have "good cause" for setting the trial in Carson City.[19] However, the burden is upon the complaining party to establish that the district court manifestly erred, or as is more commonly said "abused its discretion," in setting the place of trial. Cf. Gee Lung v. United States, 111 F.2d 640 (9th Cir. 1940). The appellants have not shown any such abuse of discretion.
 
 
 60
 The second point concerns the manner in which the district judge conducted the trial. Appellants contend that fundamental fairness was lacking — that the district judge hurried the proceedings along at an unduly fast pace, constantly interrupted counsel during the examination of witness, took over such examinations and unduly limited both their examinations and cross-examinations. Suffice to say "the record * * * reflect[s] * * * a proper desire [by the judge] to avoid needless labor and time consumption * * * and to appropriately expedite the trial proceedings. Considering all of the complaints of occurrences in the light of the whole record, we find no malice or prejudice in the Trial Judge's attitude * * * and no failure by the Trial Judge to accord them due process of law." Richmond v. Weiner, 353 F.2d 41, 47 (9th Cir. 1965).
 
 
 61
 The judgment against El Ranco on the contract claim is affirmed; the judgment against El Ranco, Katleman, Gregory and Gerber on the conspiracy claim is affirmed but is reversed as to MCA.
 
 
 
 Notes:
 
 
 [1]
 Bardy died during the pendency of this appeal and The First National Bank of Nevada was thereupon appointed administrator of his estate; thereafter by order of this court dated January 19, 1968, the Bank was substituted on the appeal as appellee. (Rule 43(a), Uniform Rules of Appellate Procedure). However, throughout this opinion we will continue to refer to Bardy as plaintiff or as appellee
 
 
 [2]
 By its agency contract with Bardy, MCA agreed not only to book his show but also to "act as a counsel in regard both to my professional career and my interests in the field of artistic and literary presentations."
 
 
 [3]
 Having thus found the defendants commonly liable on the conspiracy claim, the jury did not return verdicts on the alternative claims
 
 
 [4]
 The appellants also argue that the assignments were not properly admitted because a cause of action for fraud or similar tort cannot be assigned. See Prosky v. Clark, 32 Nev. 441, 109 P. 793, 35 L.R.A.,N.S., 512 (1910). This argument is not well taken. The cause of action in the present case is based upon injury to property rights and breach of contract both of which can generally be assigned. See 6 Am.Jur.2d Assignments, §§ 33, 41 (1963)
 
 
 [5]
 InPaterson the Nevada court equated the "doing business" provision in the assumed business name statute with the counterpart provision in the Corporation Code which required foreign corporations to domesticate as a condition of suit. It affirmed a judgment in favor of a plaintiff noncomplying corporation "on authority of the reasoning in the case of State ex rel. Pacific States Sec. Co. v. [Second Judicial] District Court, 48 Nev. 53, 226 P. 1106 (1924)." In the latter decision, the court quoted with approval this passage appearing in 14A C.J. 1273 (1921):
 "In most jurisdictions it has been held that single or isolated transactions do not constitute doing business within the meaning of such statutes, although they are a part of the very business for which the corporation is organized to transact, if the action of the corporation in engaging therein indicates no purpose of continuity of conduct in that respect."
 
 
 [6]
 El Ranco seeks to raise this point for the first time on appeal. Nowhere in the brief does El Ranco make a record reference to any request for instruction, objection to evidence or other procedural prerequisite to preserving as assignment of error; this conclusion is fortified by El Ranco's brief wherein this appears "because of all the circumstances here present this Court should here invoke the estoppel doctrine, or at least hold that a fact question for jury submission existed."
 
 
 [7]
 El Ranco relies on the rule as stated by this court in Northwest Auto Co. v. Harmon, 250 F. 832, 837 (9th Cir. 1918) [See also Casey v. Galli, 94 U.S. 673, 680, 24 L.Ed. 168, 307 (1877)] that "The parties having contracted and dealt with each other as corporations, each is estopped to deny the corporate capacity of the other." Manifestly that rule is inapplicable; Bardy was the plaintiff, not the defendant; he was not seeking to challenge El Ranco's corporate status
 
 
 [8]
 At this point we cannot refrain from criticizing counsel for El Ranco. Their proposition is a very involved one but their brief was so condensed on this issue — and contain so few record references — that we found it necessary to read a large part of the 500 page pre-trial hearing transcript where this matter was aired and to rummage through 600 odd exhibits to learn their position and ascertain the factual basis (or lack of same) for it. We do not advocate long briefs as a general practice but on occasion a complete statement of a complicated point (accompanied by proper and accurate record references), especially in a "big case," is surely warranted
 
 
 [9]
 MCA had prepared the December 1 contract, but had used a printed form applicable to employer-employee contracts for, as noted, its provisions required the artist to join AGVA and adhere to the rules of the union and it further authorized the employer to pay the union dues under a "check-off" arrangement
 
 
 [10]
 El Ranco's argument in brief contains a suggestion that the creditor must prove non-payment of this debt. Such is not the law
 
 
 [11]
 Katleman was well aware of the absence of Caire and Morrison, having received a telephone call from Caire's hotel room in Beverly Hills on the morning of April 8
 
 
 [12]
 MCA and Gerber make a further and more discriminating attack on the sufficiency of the evidence
 They argue that the proof shows two separate and unrelated conspiracies: One with respect to the breach of the extension contract and another covering the "La Nue Eve" matter. They urge that, at most, the proof shows Gerber entered into the first of the two and that therefore neither Gerber nor MCA may properly be held liable for any injurious acts committed in furtherance of the second.
 The conspiracy asserted by Bardy was broad in scope; its object was allegedly to harm Bardy in his contract-property rights incident to La Nouvelle Eve. And the case went to the jury under instructions not objected to and appropriate to that assertion. The single conspiracy theory not being objected to thus became the law of the case and MCA and Gerber may not now object.
 
 
 [13]
 Bardy conceded that MCA had not authorized Gerber to enter into a conspiracy with Katleman; nor was MCA chargeable with constructive knowledge of that fact. The general rule is that the principal is chargeable with and bound by the knowledge of his agent received while the agent is acting within the scope of his authority and which is in reference to a matter over which his authority extends. 2 Am.Jur., Agency, 368 n. 16, 104 A.L.R. 1246, 123 A.L.R. 966; Curtis, Collins and Holbrook Co. v. United States, 262 U.S. 215, 43 S.Ct. 570, 67 L.Ed. 956 (1923); Mutual Life Ins. Co. of New York v. Hilton-Green, 241 U. S. 613, 36 S.Ct. 676, 60 L.Ed. 1202 (1916). However, as Mr. Mechem points out: "But the knowledge of the particular alleged agent himself of his own authorized act cannot thus be imputed to the principal, in such manner as to satisfy the requirement of knowledge of the principal; for, as to the matter in question, the person acting is not agent until ratification, and it cannot be said that the principal has ratified with knowledge at the time of ratification simply because the person who thus becomes agent had knowledge." F. Mechem, Agency, § 407 (2d ed. 1914)
 
 
 [14]
 In response to Gerber's inter-office communication dated April 1, Stein wrote, "We were completely amazed to receive your advice that Katleman was intending to get AGVA to go along with him as a means of support in order to gang up on Bardy and leave his group stranded without notice and closing them out. * * *"
 "I am at a further loss to understand your attitude to `go along with Beldon in view of the attitude of the cast.' Artist talk is one thing, and an actual breach by them is another. You are the representative of Bardy, and I cannot see how you can put yourself in any position other than to protect his interests to the fullest extent possible."
 And on April 17, Stein agonizingly wrote Gerber: "Roy, I can well understand the difficult position you found yourself caught in between Katleman, and Bardy, as indicated by a copy of memo sent me, dated April 1. * * * However, I am completely at a loss to understand why you ran out and failed to advise Bardy what to do, via myself, even though this would be nothing more than riding with the blows at your end. It should have been us to have advised Bardy to come back to Las Vegas, and defend himself, which you should have cabled me, and then you would have been off the hook and particularly if you would have warned Bardy that Katleman was looking for an `out' and that he better get back to Las Vegas, at which point he would have worked out his own compromise or instructed you to work one out. Instead you simply disappeared. * * * Bardy was asking for my advice and I was doing plenty double talking, with absolutely no assistance from your end. When you finally cabled on April 9, as a result of my imploring cables, that `Impression Bardy was due here following AGVA meeting Monday. Definitely feel his presence might have saved situation' then I really gave up. It may be unjust for we here to try and justify your actions and try to defend our company, but on this one you really had me. Why didn't you cable Bardy to come. What are his representatives for?"
 
 
 [15]
 El Ranco's liability could also have been rested on actual authority of Katleman to enter into the conspiracy: "The president and general manager, or, in his absence, the vice president in his place, actually wielding the whole executive power of the corporation, may well be treated as so far representing the corporation and identified with it, that any wanton, malicious, or oppressive intent of his, in doing wrongful acts in behalf of the corporation to the injury of others, may be treated as the intent of the corporation itself." Lake Shore and Mich. S. Ry. v. Prentice, 147 U.S. 101, 114, 13 S.Ct. 261, 265, 37 L.Ed. 97 (1893)
 
 
 [16]
 In any case it does not appear that the instructions were incorrect under Nevada law. See Aldabe v. Adams, 81 Nev. 280, 402 P.2d 34 (1965); Hotel Riviera, Inc. v. Short, 80 Nev. 505, 396 P.2d 855 (1964)
 
 
 [17]
 Federal Trademark Act (Lanham Act), 15 U.S.C. § 1126(b) (g) (h) (1964)
 
 
 [18]
 The appellants argue that damages could not properly be based upon Bardy's lost profits since the show was a new business in Las Vegas and any award based on loss of future profits would be founded on sheer speculation. They rely strongly upon Knier v. Azores Construction Co., 78 Nev. 20, 368 P.2d 673 (1962) wherein the Nevada Supreme Court stated: "Where the loss of anticipated profits is claimed as an element of damages, the business claimed to have been interrupted must be an established one and it must be shown that it has been successfully conducted for such a length of time and has such a trade established that the profits therefrom are reasonably ascertainable." Id. at 24, 368 P.2d at 675. However, this rule is inapplicable when profits are reasonably ascertainable. The extension contract between El Ranco and Bardy indicates that Bardy could clear $5,000 profits each week the show played. MCA admitted that it could probably book the show on a continuous basis in Las Vegas. Uncontroverted expert opinion testimony substantiated MCA's admission. Evidence showed that other Paris-type revues played in Las Vegas for several years. With this evidence the jury could reasonably ascertain the lost profits. As the Nevada Supreme Court also said inKnier, supra: "The rule against the recovery of uncertain damages generally is directed against uncertainty as to the existence or cause of damages rather than as to measure or extent." Id. at 24, 368 P.2d at 675.
 
 
 [19]
 Local rule 3(b) of the United States District Court for the District of Nevada provides: "Nothing herein contained shall prevent the court, for good cause, from directing that proceedings or trial be had at a place within the District where the court is held other than where the action is filed."